## LONG *v.* CITY OF MONROE.

1. MUNICIPAL CORPORATIONS—PETITION FOR IMPROVEMENT—SIGNATURES—JOINT OWNERS.

   Signature by one of two joint owners of land is insufficient to permit counting of frontage thereof as represented on petition for municipal improvement.

2. PRINCIPAL AND AGENT—POWER OF ATTORNEY—CONSTRUCTION—MUNICIPAL IMPROVEMENT.

   Power of attorney is strictly construed and one which authorizes sale or leasing of land does not authorize the placing of incumbrance thereon for municipal improvement.

3. MUNICIPAL CORPORATIONS — PETITION FOR IMPROVEMENT — JOINT OWNERS—ATTORNEY-IN-FACT—SIGNATURES—VALIDATION.

   Signature to petition for municipal improvement by attorney-in-fact as for one of two joint owners, although he was attorney-in-fact for both, is not validated by subsequent letter to attorney sent by the one as for whom signature was made.

4. SAME—CONTRACT PURCHASER.

   Signature to petition for municipal improvement by contract purchaser of land was invalid where deed to him then in escrow was altered prior to delivery by adding another as joint tenant with right of survivorship.

5. SAME—PUBLICLY-OWNED LAND—CHARTER.

   Frontage of publicly-owned land was properly included in determination of total amount of assessable property for municipal improvement where assessments actually were made and charter provided for apportionment and payment of special assessments on publicly-owned land (Monroe charter, § 165).

6. SAME—SIGNATURES ON EARLIER PETITIONS.

   Claim that frontage owned by signers of earlier petitions for same municipal improvement should be included is not passed upon where such frontage is not sufficient to overcome deficiency present.

   WEADOCK, J., dissenting.

Appeal from Monroe; Sampson (Jacob N.), J., presiding. Submitted October 3, 1933. (Docket No. 1, Calendar No. 35,514.) Decided December 19, 1933. Rehearing denied January 30, 1934.

Bill by A. M. Long and others against the City of Monroe, a municipal corporation, and others to enjoin collection of special assessments for a municipal improvement. Decree for plaintiffs. Defendants appeal. Susan M. Long intervened. Affirmed.

*Goodenough, Voorhies, Long & Ryan,* for plaintiff Long and intervener.

*Clayton C. Golden* and *James J. Kelley,* for other plaintiffs.

*J. C. Lehr (Miller, Canfield, Paddock & Stone,* of counsel), for defendants.

NORTH, J. This appeal involves the validity of special assessments levied against appellees' properties incident to widening Monroe street in the city of Monroe. The city charter provides that an improvement of this type shall not be ordered "unless the owners of a majority of the frontage to be assessed shall petition therefor (section 161)." In the circuit court decree was entered restraining the assessments on the ground, among others, that the petitions for the improvement did not contain valid signatures of the owners of sufficient frontage to comply with the requirements of the city charter. Defendants have appealed.

The total frontage assessed for this improvement is 9,199.50 feet. Under the charter the improvement could not be ordered except the petition or petitions filed therefor represented more than

4,599.75 feet. Decision turns upon whether such petitions were presented.

The total frontage for which petitioners signed was 4,768.15 feet. This included 240 feet owned jointly by Mr. and Mrs. Newcomer and 81 feet owned jointly by Mr. and Mrs. Southworth. The petitions were signed only by Mr. Newcomer and Mr. Southworth respectively. These signatures were not sufficient, being in each instance the signature of only one of the two joint owners. *Auditor General* v. *Fisher,* 84 Mich. 128; *Hinkley* v. *Bishopp,* 152 Mich. 256; *Bakker* v. *Fellows,* 153 Mich. 428.

Another parcel having a frontage of 23 feet was owned jointly by Mr. and Mrs. John Re. As to this parcel the petition was signed "John Re by Carl Kiburtz, atty. in fact." Mr. Kiburtz was also the attorney-in-fact for Mrs. Re but he did not sign for her. On this account the signature was insufficient. Further, we think the power of attorney held by Mr. Kiburtz did not vest him with authority to sign the petition. So far as material, it empowered him "to sell and convey any lands * * * owned by us or either of us in the county of Monroe and State of Michigan and to make, execute and deliver in our names all necessary and incident deeds of conveyance and assignments, bills of sale, or other instruments that may be in the premises required." It also empowered the attorney to lease any and all lands owned by Mr. and Mrs. Re or either of them. It would seem too clear for argument that the power of attorney never contemplated vesting Mr. Kiburtz with authority to sign petitions for local improvements and thereby subjecting the property to the incumbrance incident to an assessment. The rule is that a power of attorney should be strictly construed. It cannot be extended by construction. And

a power of attorney to sell or to lease land does not authorize placing an incumbrance thereon. *Jeffrey* v. *Hursh,* 49 Mich. 31; *Penfold* v. *Warner,* 96 Mich. 179 (35 Am. St. Rep. 591). Nor can we hold that the subsequent approval by Mr. Re by letter to the attorney validated the signature.

As to another parcel having a frontage of 22.2 feet the petition bears the signature of Clyde K. Hasley. At the time the petition was signed this parcel was owned by the Hoffman heirs. Mr. Hasley was in possession. He had made an agreement for the purchase of the property and had made a down payment. A deed had been made out to him and left with a third party. It had not been delivered. Before delivery the deed was altered by inserting his father's name as a joint grantee with a right of survivorship. It therefore appears that at the time of signing the petition Clyde Hasley was not the owner of the property and that when title subsequently passed it vested in himself and his father as joint tenants with the right of survivorship. As to this parcel the petition did not bear a valid signature.

The four parcels referred to in the next preceding paragraph have a total frontage of 366.2 feet. Deducting this frontage from the total represented by the petition and assuming, but not deciding, that other signatures to the petition were valid, the net frontage as to which the respective signatures are sufficient is 4,401.95 feet. This is short of the requisite 4,599.75 feet to the extent of 197.80 feet.

Appellants challenge the correctness of the above computation. They assert that the city engineer in testifying to the total amount of assessable frontage as being 9,199.50 feet erroneously included 417.9 feet frontage of the following publicly-owned property: Post office, owned by the United States, 283.5

feet; Dorsch Memorial Library, owned by the board of education, 37 feet; city hall and fire department, owned by the city, 41.5 and 45.9 feet respectively. Appellants contend that since these parcels are publicly owned and are not subject to general taxation, they should not be included in determining the amount of "frontage to be assessed." This is a somewhat inconsistent position for the appellants because not only did they include these properties in arriving at the total assessable frontage but they actually made assessments against these parcels. But aside from this, the untenability of appellants' position is conclusively established by the following charter provision:

"If there shall be included in any special assessment district lots belonging to the city, schools, other public buildings or public grounds not taxable, such part of the expense of such improvement as in the opinion of the commission or city assessors making the special assessment would be justly apportionable to such public grounds, buildings and city property * * * shall be paid from the general fund, or from the proper street district fund, or partly from each, as the commission shall determine to be just." City Charter, § 165.

Clearly under this charter provision publicly-owned property is subject to assessment the same as privately-owned property, notwithstanding such assessment is payable from general city funds or street funds instead of being payable by an individual or corporate owner. Omission of frontage of publicly-owned property in computing the total assessable frontage incident to determining the sufficiency of the petitions for this improvement would clearly be in violation of the city charter. Because of the express charter provision above quoted, *City of Big Rapids* v. *Mecosta County Su-*

*pervisors,* 99 Mich. 351, and *People, ex rel. Auditor General,* v. *Ingalls,* 238 Mich. 423, cited and relied upon by appellants, are not in point.

Appellants further claim that signers of earlier petitions than the one above considered owning frontage totaling 123.7 feet should also be included, if necessary, in determining whether these assessments should be held valid. We do not pass upon this question because should decision sustain appellants' contention the amount of the frontage involved is not sufficient to overcome the deficiency above noted. Decision of other questions presented by the record is not necessary to determination of this case.

The decree entered in the circuit court is affirmed, with costs to appellees.

McDONALD, C. J., and POTTER, SHARPE, FEAD, WIEST, and BUTZEL, JJ., concurred with NORTH, J.

WEADOCK, J. (*dissenting*). Suit was brought in the circuit court in chancery to set aside special assessments levied by the city of Monroe for the widening of Monroe street.

Several petitions were circulated and filed praying for the widening and straightening of Monroe street between Front street and Elm avenue and the construction of a bridge across the Raisin river. The entire cost of the construction of the bridge and one-half the cost of widening the· street was to be borne by the city of Monroe, the other half of the cost to be defrayed by a special assessment district.

The charter of the city of Monroe provides that no improvement, except sewers, shall be paid for by special assessment except on petition of a majority of the frontage of land to be assessed, and provides

also that ''the city commission shall cause estimates
of the expenses thereof to· be made and also plats
and diagrams of the work and of the locality to be
improved and deposit the same with the city clerk
for public examination; and they shall cause ten
days' notice thereof and of the proposed improve-
ment or work, and of the district to be assessed, and
of the time when the city commission will meet and
consider any objections thereto to be published once
immediately preceding the time of such meeting in
one or more newspapers of said city'' (section 161).
On March 7, 1927, an election was held to vote on
the bond issue for the construction of the bridge and
for the city's share of the widening of Monroe
street.  After the bonds were authorized and sold,
the commission proceeded to hear objections to the
improvement, to complete the condemnation of land
and to review the assessment roll.  On March 5,
1928, the roll as originally prepared was set aside
as ''inequitable and contrary to the charter of the
city of Monroe.''  On that same date the last peti-
tion for such improvement was filed and on April 9,
1928, new resolutions were adopted by the city com-
mission declaring its intention to make such public
improvement.  A new hearing of objections to the
improvement was held, a new assessment roll or-
dered, reviewed and confirmed.  On May 5, 1928,
plaintiffs filed their objections to the levying of a
special assessment for such improvement on the
ground that the petitions were not signed by the
owners of a majority of the frontage of private
lands along or in front of which such proposed im-
provement was to be made and that the district as
laid out was improper, arbitrary and discriminatory.
On May 7, 1928, the commission overruled said ob-

jections. On July 20, 1928, plaintiffs were granted a writ of injunction by the circuit court restraining the levying of such special assessment, which was afterwards made permanent by the decree of the court and from which the defendants have taken this appeal.

The bill of complaint by the parties objecting to paying the taxes assessed against them for an improvement by widening of Monroe street, which has been completed, was filed on July 20, 1928. The decree was filed November 27, 1929, and the return to appeal was filed February 28, 1931. It is assumed that the work complained of was finished and paid for.

This is a case in equity. The defendants do not offer to pay any portion of the tax assessed against them although their property has been improved, and the city of Monroe and other property owners have paid.

Their contention is that the tax is illegal in its entirety and the burden of establishing that is upon them and the presumption in favor of legal official action is against them. They contend as stated by appellants and agreed to by appellees—

1. The widening of Monroe street was not petitioned for by the owners of a majority of the frontage to be assessed.

2. A corporation owning assessable land cannot legally sign such a petition by an officer or agent without a formal resolution of the board of directors.

3. Where several successive petitions have been filed for the same improvement, signatures on the earlier petitions cannot be counted in ascertaining the frontage the owners of which have petitioned therefor.

4. The assessment district as established was fraudulent and void, as arbitrary, discriminatory and disproportionate.

A. M. and Susan Long, plaintiff and intervener, claimed their land was held by entireties.

These will be considered in their order:

1. Was the petition signed by owners of a majority of frontage?

The charter provides, section 161:

"Unless the owners of a majority of the frontage to be assessed shall petition therefor, no such improvement or work shall be ordered, except sewers as herein provided for."

The petition was referred by the city commission to the city engineer, assessor and city attorney "for the tabulation and the validity of the signatures thereto" and the city engineer reported "that the total frontage was 9,199.50 feet, signed 4,768.15 feet, required 4,599.75 feet, majority 168.4."

The city engineer testified:

"I arrived at the total frontage by measuring the total district front. I arrived at the figure 9,199.5 feet. Then we added up the signers exactly what we surveyed. I only exempted the street intersections and the alley intersections, but did not exempt public property from the total frontage, and then we added up the signers to see whether they signed exactly what we surveyed."

The charter provides as above quoted, for petition by the owners of a "majority of the frontage to be assessed." It is therefore obvious that any property not assessable is not to be counted in ascertaining the total frontage. There are in the assessment district the following parcels of property

publicly owned and used for governmental purposes:

Post office, owned by the United States. . 283.5 feet
Dorsch Memorial Library, owned by the
    board of education, and used as a public
    lic library and for meetings of the
    board of education.................. 47.0 feet
City hall, owned by the city of Monroe. . 41.5 feet
Fire department, owned by the city of
    Monroe ........................... 45.9 feet

        Total frontage ........... 417.9 feet

It is held in *City of Big Rapids* v. *Mecosta County Supervisors,* 99 Mich. 351, that "implied exemptions exist where property is owned and held by the State, its political subdivisions, and its municipalities for governmental purposes," and that this implied exemption, unlike that of churches, hospitals, etc., includes exemption from special assessments as well as from general taxes.

This decision was followed in *People, ex rel. Auditor General,* v. *Ingalls,* 238 Mich. 423, where it was said:

"The doctrine has been pretty well settled in this State and elsewhere that property owned by the State or by the United States is not subject to taxation unless so provided by positive legislation. And municipalities and State agencies are included in this class when their property is used for public purposes."

It is, therefore, beyond question that these parcels are exempt from assessment, and are not a part of the "frontage to be assessed." *Ahern* v. *Board of Improvement District No. 3 of Texarkana,* 69 Ark. 68 (61 S. W. 575); *City of Malvern* v. *Nunn,* 127 Ark. 418 (192 S. W. 909).

Deducting this 417.9 feet from the total frontage reported, of 9,199.5, leaves the total frontage on which the computation is to be based 8,781.6, one-half of which is 4,390.8. With the total frontage thus corrected, the frontage signed for, 4,768.15 feet, exceeds one-half of the frontage, 4,390.8, by 377.35 feet, and this is the amount from which any frontage improperly signed for is to be deducted.

Aside from the signatures of corporations, which will be considered later, plaintiffs, in their brief in the court below, objected, and presumably now object, to certain signatures on the ground that the land was owned by man and wife as tenants by entireties, while the petition was signed by the husband only. These signatures are as follows:

L. W. Newcomer...................... 240 feet
C. B. Southworth..................... 83 feet
John Re ............................ 23 feet

The record is clear that these properties were owned by the entireties. We concede the law to be that the wife must join in the petition in such cases. We therefore concede that the Newcomer and Southworth parcels are to be excluded. It appears, however, that the Southworth frontage is 81 feet instead of 83 feet as stated on the petition.

The name of John Re was signed by Carl Kiburtz, attorney-in-fact. His power of attorney which was produced in evidence is signed by John Re and Mary Re, his wife. At the time he signed, and even at the time of the trial, until the power of attorney was produced, Mr. Kiburtz was under the impression that Mr. Re was the sole owner and that the power was given by him alone. As he clearly meant to sign for the true owner and in accordance with his power, the signature of the agent should be re-

garded as the signature of both his principals, though he inadvertently signed only one name.

So far as this objection goes, we submit that there should be deducted,

L. W. Newcomer........................ 240 feet
C. B. Southworth........................ 81 feet
Total.................. 321 feet

Taking this from the total frontage signed, 4,768.15, or the majority of 377.35, as above computed, leaves a total signed frontage of 4,447.15, or a majority of 56.35 feet over the necessary 4,390.8 feet.

2. Are corporation signatures on the petition in question valid without resolution of board of directors?

These signatures were objected to:

Standard Oil Co. (Ind.) by E. L. Sharp, agent ........................... 137.6 feet
American Legion Ass'n, H. E. Barrows, commander ................. 56.4 feet
McMillan Printing Co., by John S. McMillan, president ................. 360 feet
Huron Farm Co., per W. J. Fitzgerald, agent ........................... 50 feet
Monroe Publishing Co., by J. S. Gray, president ........................ 91 feet
Monroe Lumber Co., by W. S. Sterling 236 feet
J. R. Denniston Theatre Co., J. R. Denniston, president ................... 45 feet
Central States Utilities Co., by S. C. McKenzie, agent .................... 87 feet
Knights of St. John Ass'n, A. J. Weier, president ........................ 22.6 feet
Monroe Steam Laundry, Edw. G. Mauer, president, treasurer........ 186 feet

| | | |
|---|---:|---|
| Knights of Columbus Home Ass'n, by | | |
| W. E. Sturn, president............ | 63 | feet |
| Schrauder & Co., Erhardt Schrauder, | | |
| president ...................... | 23 | feet |
| The N. Y. C. R. R. Co................ | 211 | feet |
| | 1,568.6 | feet |

Officers or agents of a corporation may derive their authority (1) from the by-laws; (2) from the directors, acting by resolution at a meeting, (3) from mutual consent or acquiescence. The rule is stated in 2 Thompson on Corporations (3d Ed.), § 1516:

"But where the act is within the scope of the officer's employment, a formal resolution of authorization is not required; his authority will be presumed. The corporate by-laws are admissible for the purpose of showing the scope of the officers' authority, and parol evidence as well; and the authority of officers to do particular acts may also be implied from circumstances, as, from the course of business and the construction which the corporation itself has placed upon officers' powers. * * * It is not absolutely essential that the authority of a corporate officer to do a particular act should be in the form of a resolution of the directors, but it may be by oral vote, or may be shown by the acquiescence of the corporation on other occasions."

The decisions of this court have likewise established the principle that the management of a corporation is subject to the rule of reason and not of arbitrary technicality. We refer to the following cases, as containing brief and clear statements as to the implied, or presumed, powers of corporate officers:

"In the absence of any provision to the contrary contained in the charter of a corporation, it will be

presumed that its president, secretary and treasurer have the authority to make all necessary contracts in transacting the ordinary business of the corporation within the legitimate scope, objects and purposes of its organization." *Eureka Iron & Steel Works* v. *Bresnahan,* 60 Mich. 332.

"We think that persons dealing with such a corporation for work have a right to get their information from the person whom the corporation has put in charge, and cannot be required to go elsewhere, and that contracts so made are valid contracts when relating to the ordinary concerns of such business. And if persons are not sustained in contracting with such superintendents they can never be safe. They have no means of knowledge except inquiry somewhere, and the person put by the corporation in open charge of the business must have power, as to third persons, to represent it." *Whitaker* v. *Kilroy,* 70 Mich. 635.

"A president of a manufacturing company, who is in the active conduct and management of the business, must be presumed to have all the powers of any agent exercising like control or management, and to have authority to do what is usually and ordinarily done by such agents or managers. The primary intention of a corporation in employing an agent is that he shall be enabled to accomplish the purpose of the agency, and other persons are invited to deal with the agent upon that understanding." *Ceeder* v. *H. M. Loud & Sons Lumber Co.,* 86 Mich. 541 (24 Am. St. Rep. 134).

"Was there authority in Mr. Keen, under the circumstances, to make the agreement claimed for the defendant? The record is silent as to any action on the subject by the directors. The plaintiff claimed and testified that from the first Mr. Keen took charge of and handled the business, and made the contracts for the defendant and was really the

general manager, and that all of the directors and officers knew of plaintiff's employment and of payments made to him. We think there was evidence of authority in Mr. Keen, as president and manager to make the contract." *Galvin* v. *Steering Wheel Co.,* 176 Mich. 569.

"Where the president is given power as general manager of the business with full direction and charge thereof, he has the power to do any act or make any contract that the president and general managing agent of such a corporation could do or make in the ordinary transaction of the corporate business, and *prima facie* has power to do any act which the directors could authorize or ratify, unless special limitations or restrictions are put upon such power, of which the party dealing with him has notice, or unless power to do the particular act is expressly given to another officer or agent." *Cope-Swift Co.* v. *John Schlaff Creamery Co.,* 223 Mich. 543.

"Plaintiff sued for cartage services they claimed to have rendered defendant company under employment by Mr. Mansfield, its president and general manager. * * * Mr. Mansfield, holding the position of manager of defendant company and exercising direct supervision over shipments for the company, could give the instructions claimed and bind defendant by his promise in its name, to pay for the services rendered." *Garfield* v. *Mansfield Steel Corp.,* 223 Mich. 694.

"To hold that the president, who was also acting as general manager, could not bind the company in the purchase or sale of property without authority of the board of directors, expressly conferred by resolution, would in effect nullify the purpose for which the corporation was formed, as it is a matter of common knowledge that such deals must at times be quickly consummated." *Murphy* v. *Frank P. Miller Co.,* 229 Mich. 162.

The rule is also well stated in *Moore* v. *H. Gaus & Sons Manfg. Co.*, 113 Mo. 98 (20 S. W. 975), where the court said:

"It will be observed that defendant's counsel do not base their contention of the insufficiency of the assignment upon any ground save that it could only be lawfully effected by the board of directors.

"In the matters of simple contract no such rigid rule obtains in this State. The power of an agent or officer of a corporation to bind his principal is governed by the law of agency, and, where an officer has been permitted to manage all the business of a corporation, his authority to bind it will be implied from the apparent power thus conferred upon him."

It remains to apply these rules to the subject-matter of the power to sign a petition of this character. Although a properly signed petition is essential to the jurisdiction of the city to levy the assessment, the petition does not thereby acquire any superior dignity or formality in its relation to the internal management of the corporation signing it. It is not a conveyance of property or a change in the nature of the corporate business, requiring exceptional care and discretion. It is a mere matter of ordinary business, and usually one of minor importance to the corporation, such as is usually entrusted to the active managers.

"We are of the opinion that the petition was sufficient to give the city council of Altus jurisdiction to pass a resolution of necessity, and that the plaintiffs have failed to sustain the burden of proof that the signing of said petition by said Carl McNulty was unauthorized." *City of Altus* v. *Bates*, 138 Okla. 291 (281 Pac. 138).

Many other cases are cited in the able brief filed for appellants.

The cases of *Allen* v. *City of Portland,* 35 Ore. 420 (58 Pac. 509), and *Brown* v. *Town of Hillsboro,* 185 N. C. 368 (117 S. E. 41), also support the view that such authority can be given by ratification, and that ratification may be given orally or informally, as well as by express resolution.

It is also held that where a corporation has authorized or ratified the signature of its name in such manner as to bind the corporation itself, whether such authority or ratification were express and formal or arose from acquiescence and inaction, the signature cannot be disputed by any third party for the purpose of invalidating the petition, which the corporation itself cannot or does not attack.

"There is no evidence that the directors ever repudiated the action of the president. They acquiesced therein, and there can be no doubt that at the time this action was begun the corporation was estopped to deny the authority of the president to bind the corporation by his signature. It was not necessary to show a general custom or usage in that regard." *Eddy* v. *City of Omaha,* 72 Neb. 550, 559, 561, 567 (101 N. W. 25, 102 N. W. 70, 103 N. W. 692).

"There would seem to be an express agency for the pastor or rector to do just what was done by him in signing the application in the corporate name of the church. Even if it were not so, so far as the prosecutor herein is concerned, the knowledge on the part of the members that the pastor was taking this action, or like action, on which the public relied, constituted an implied authority. It certainly would estop the church corporation from objection to such action of the public thereon, and it would be, in reason, conclusive against the prosecutor. Thom. Corp. Off. § 488, and cases cited. * * * This ratification standing alone would estop the church from a re-

view of these proceedings for the reason urged by the prosecutor, and certainly the interest of the prosecutor, so far as his objection goes, is only to see that it is clear that the signature is one which gives the assent of the corporation to the application for the improvement." *Day* v. *Fairview,* 62 N. J. Law, 621 (43 Atl. 578).

Another rule which supports the validity of the petition is that the officers are presumed to have acted with authority and that the burden of proof is on the plaintiffs attacking the petition to prove the want of authority, and not on the city to prove its existence.

"The petition was signed in the name of the railroad company 'J. A. Barnard, general manager.' There was no evidence of a want of power in Mr. Barnard, who was proved to be the general manager of the railroad company, to sign the name of the company, and the only claim was that he had no such implied power, as a matter of law, to do such an act in the absence of proof of express authority from the company. The court was asked to presume that the signature was unauthorized, while the presumption created by the statute is to the contrary. * * * Appellants took upon themselves the burden of proof to show a want of authority, and if it is true that express authority in the by-laws, or otherwise, was required, it was incumbent upon appellants to prove that it did not exist." *McVey* v. *City of Danville,* 188 Ill. 428 (58 N. E. 955).

To sustain the burden of proof, plaintiffs must show: (1) that the officer signing was not authorized by the by-laws, either specifically to sign papers of this kind or generally to conduct the ordinary business of the company; (2) that he was not so authorized by the board of directors, either specifically or generally; and (3) that he was not so

authorized by common consent or acquiescence.
Plaintiffs have not sustained the burden of proof in
these respects by producing evidence sufficient to
negative the presumption of authority. This is not
a suit brought against the corporation itself, in
which the corporation has superior knowledge and
facilities for proving its records, proceedings, cus-
toms and practices. The corporations are not par-
ties to the suit, and their financial interest is now
with the plaintiffs rather than with the defendants.
They are all subject to assessment for this improve-
ment; the improvement has been made and they
have received any benefit that may come from it; the
only question now remaining is whether they shall
pay the assessment or be relieved from it. It is,
therefore, not to be presumed that they are with-
holding any evidence from the plaintiffs, or coloring
the facts in favor of defendants. Plaintiffs should
be held to strict proof of all the elements of their
case, and any facts not proved should be regarded
as favorable to defendants. None of these corpora-
tions is contesting the assessment. It is therefore
evident that every one of them considers its signa-
ture as duly authorized and binding. The record
sustains these points.

3. Can signatures on earlier petitions be counted
in ascertaining frontage signed for?

Several petitions were filed for this improvement,
described as Exhibits 1 to 7, inclusive. None of the
petitions were ever withdrawn or rejected, all re-
mained on file with the city clerk and on record.

"None of the petitions were disregarded or re-
jected. All of them were before the commission and
still are before the commission. I would consider
any other petitions just as well as that petition."

The charter does not require "a petition" as a jurisdictional prerequisite, or require its filing at any particular time or in any particular manner. It only provides that:

"Unless the owners of a majority of the frontage to be assessed shall petition therefor, no such improvement or work shall be ordered."

Any number of petitions filed at any time before the improvement is ordered will comply with this requirement in letter and in spirit. It is not even required that the petitions define the assessment district. They could not do so authoritatively, as the district is not determined until the improvement is ordered. It is only necessary that "a majority of the frontage to be assessed," as may finally be determined, shall have petitioned therefor, to-wit, for the improvement. The owners who signed any one of the seven petitions asking that the improvement be made have petitioned therefor. It was evidently so considered by the commission, for supplementary petitions were received from time to time.

This court has held in *City of Sandusky* v. *Roberts*, 226 Mich. 63, that a petition filed after an improvement had been ordered and completed was sufficient to support a reassessment under a charter provision authorizing an improvement "ordered by the council upon a petition of the owners of a majority of the land liable to be assessed." The court said:

"It might be well to state that this petition was signed by the owners of a majority of the real estate which would be affected by the special assessment, and that the owners were the same as when the improvement was first initiated. The petition also expressly ratified all that had been done by the council in making the improvement. We are con-

strained to hold that the filing of this petition, which meets the requirement of the proviso in this statute, although delayed, validated the proceedings and gave the council jurisdiction to enforce the tax.''

If a jurisdictional petition filed after the improvement can be considered to validate the proceedings, there can certainly be no objection to considering several petitions, which have never been withdrawn or rejected, as remaining in force until acted upon.

In *Campbell* v. *Park,* 32 Ohio St. 544, it was held that a petition rejected only for insufficiency of signatures remains effective so as to permit the signers thereto to be counted in addition to those signing a new petition for the same improvement. In the present case the earlier petitions were not rejected but remained on file to be acted on at any time the commission might choose.

Many of the signers of the earlier petitions also signed the later ones, and many names are lined out, by whom or for what reason does not appear. Omitting all duplications and erasures, we find the following signatures on the earlier petitions which do not appear on exhibit 7:

Louis Telbizoff, .....................Ex. 2   20
Charles W. Bell, .....................Ex. 5   45.5
Frank J. Yaeger & Sons, Inc.,.........Ex. 6   15.7
Edward J. Egle and Charlotte M. Egle Ex. 6   42.5
                                             ——
                                             123.7

None of these signatures are impeached or questioned in the testimony. A. M. Long, who signed Ex. 2 for 238 feet, as this court by order of April 19, 1933, permitted Susan Long, his wife, to intervene and file a supplement to the record, showing this property for which he signed to be held by entireties. Such supplement to the record should not

be permitted to inure to the benefit of the other plaintiffs, who negligently failed to offer this evidence at the proper time, and who did not join in the petition on which the order was made. Except as to Susan Long, the case should be heard on the record made and the Long frontage of 238 feet should be counted.

If plaintiffs' position is sustained on question 2, and the corporation signatures are counted, this question becomes immaterial, but if any of the corporation signatures are discarded, a recomputation will be necessary. Taking the figures shown above, we find

|  | | Feet |
|---|---|---|
| Total frontage, including public property | | 9,199.50 |
| Property publicly owned and nonassessable | | 417.9 |
| Assessable frontage | | 8,781.6 |
| One-half required | | 4,390.8 |
| Frontage signed | 4,768.15 | |
| Deduct joint property | | |
| Newcomer | 240 | |
| Southworth | 81 | 321 |
| Qualified signatures (including corporations) | | 4,447.15 |
| Majority | | 56.35 |
| Add signatures to earlier petitions | | 123.7 |
| Majority | | 180.05 |

Unless therefore corporate signatures for more than 180 feet are set aside the petitions will be sufficient, and if the Long property is counted, the margin will be increased to 418.15 feet.

4. Was the assessment district established fraudulent and void, as arbitrary, discriminatory and disproportionate?

Plaintiffs' contention is entirely unsupported by the evidence. The most that can be said is that there is testimony tending to show that some property outside the assessment district is benefited and might properly be included in the district. The laying out of the assessment district is committed by law to the council, and the decision of the council, within its jurisdiction, is not subject to review by the court.

"Where the benefit is peculiarly a matter of opinion, usually courts will not interfere. Ordinarily determination by the appropriate municipal authorities that property will be benefited, being legislative, will not be reviewed by the courts unless there is a showing of fraud or grossly arbitrary action." 5 McQuillin on Municipal Corporations (2d Ed.), § 2192.

"It has been uniformly held that the action of the municipal legislature in pursuance of charter powers in establishing a district to be benefited by local public improvements so as to justify a special assessment against property lying within the district is conclusive in the absence of any evidence that it was procured by fraud or proof that it is manifestly arbitrary or unreasonable, or that the assessment is palpably unjust and oppressive." 5 McQuillin on Municipal Corporations (2d Ed.), § 2201.

The rule is laid down by this court in *Powers* v. *City of Grand Rapids*, 98 Mich. 393, as follows:

"The right to assess lands for local improvements does not depend upon the use to which the owner may choose to put such land, or whether he may see fit to put it to any use. The charter expressly provides that the benefits shall be assessed upon the owners or occupants of taxable real estate in

proportion, as nearly as may be, to the advantage which such lot or parcel is deemed to derive from the improvement. It cannot be said that the improvement does not benefit complainant's property, and the measure of that benefit is for the council and commissioners. These officers acted within the scope of their powers, and the record contains no evidence of fraud, corrupt motive, or intentional favoritism. The presumption is that, in making the district and the assessment, the officers of the municipality acted in good faith, and have correctly and faithfully exercised the discretion reposed in them. In such case, where mistake or abuse of discretion is not manifest or demonstrable, the determination of the municipal officers in whom such discretion is vested is conclusive, and it is not reviewable by the courts."

It is clearly and briefly reaffirmed in *Roberts* v. *City of Sandusky*, 158 Mich. 521, as follows:

"The statute leaves it to the council, and not to the courts, to establish and fix special assessment districts for such improvements, and to assess, if they so determine, the whole of the compensation awarded upon the owners of the property included in the district and, in the absence of fraud or bad faith, their judgment is conclusive."

The principle is recognized in those cases in which assessments have been set aside, and in those cases clear proof has been required, not of mere error in judgment, but of obvious injustice or the adoption of an unjustifiable plan of assessment.

"It is accepted as a general rule that the determination of municipal officers in whom discretion is vested to decide upon assessment districts and levies of assessments should be treated as conclusive in the absence of mistake or abuse of discretion amounting to fraud." *McKee* v. *City of Grand Rapids*, 203 Mich. 527.

"It is uniformly recognized that the judgment and discretion of assessing officers, if honestly exercised upon a correct theory, is not reviewable by the courts. But if such judgment and discretion are exercised in bad faith, fraudulently and arbitrarily, the court of equity is not powerless to afford relief. To the judicial branch of the government is not committed the exercise of judgment and discretion in fixing the value of property, or the area of a special assessment district, for the purposes of taxation and assessment of benefits; but to the court of equity is committed the jurisdiction to relieve from fraud in proper cases." *Dewey* v. *City of Flint,* 205 Mich. 195.

Many similar citations might be quoted.

In *Marks* v. *City of Detroit,* 246 Mich. 517, Mr. Justice McDonald, speaking for the court, quoted from *Brown* v. *City of Grand Rapids,* 83 Mich. 101:

"It is not for this court to set its judgment up in opposition to that of the board of commissioners and the council, and to say that this parcel of land or that is assessed too much or too little. The assessments were to be made according to benefits to each parcel of property and there is nothing in the record showing that the commissioners did not assess the complainant's land in accordance with their best judgments."

"There is no showing that the board of assessors and the common council either knew or had good reason to believe that the effects of the widening would not benefit the owners of property, abutting the improvement, if such be the case. For this reason we must hold that the assessments are valid and cannot be set aside, except where obvious mistakes have been made." *Frischkorn Investment Co.* v. *City of Detroit,* 257 Mich. 546.

Bearing in mind that plaintiffs must prove, not only that the city commission erred in its judgment

in including or excluding certain property from the district, but that its error was so gross and unjustifiable as to show that it did not exercise its judgment at all, we will examine the evidence as to method and principle of laying out the district and levying the assessment.

Most of the evidence consists of cross-examination of the mayor, city engineer and city assessor. This kind of evidence is condemned by this court in *Lowrie & Robinson Lumber Co.* v. *City of Detroit*, 237 Mich. 138, where it was said:

"But we shall not rest decision on this feature of the case, as we do not feel that the practice of calling assessing officers and cross-examining them as to the mental processes used in making the assessment should be encouraged, at least where fraud is not involved. In *Newport Mining Co.* v. *City of Ironwood*, 185 Mich. 668, it was said by Mr. Justice OSTRANDER, speaking for the court:

" 'It was held in *Chicago, etc., R. Co.* v. *Babcock*, 204 U. S. 585 (27 Sup. Ct. 326), cited by plaintiff, that in an independent proceeding attacking the judgment of an assessing board it is improper to cross-examine the members in an attempt to exhibit confusion in their minds as to the method by which the result was reached.' "

The commission exercised great care and diligence to make a proper assessment. One assessment was set aside as inequitable. Before the present roll was confirmed, a committee of disinterested citizens was appointed to sit with the commission at the hearing. This committee, as well as the commission, unanimously agreed that the assessment, with minor changes made at the hearing, was equitable. There is no evidence that it did not act in good faith or that its decision was incorrect.

The decree should be reversed and a decree entered here holding the tax valid and requiring plaintiffs to pay. Costs to appellant.