## FLUCKEY *v.* CITY OF PLYMOUTH.

1. TAXATION—SPECIAL ASSESSMENT.

   The theory of the special assessment for a public improvement is that a special benefit has been conferred upon the property assessed, over and above that conferred upon the community itself.

2. MUNICIPAL CORPORATIONS—PUBLIC IMPROVEMENT—SPECIAL ASSESSMENTS—FRAUD IN LAW.

   Special assessments based upon the enhancement of the value of property is a fraud in law upon the property owner, where, viewed in its entirety, no benefit has been conferred by the public improvement, but rather a detriment suffered.

3. SAME—PUBLIC IMPROVEMENT—REPAVEMENT AND WIDENING OF COUNTRY ROAD—SPECIAL ASSESSMENT—FRAUD IN LAW.

   Special assessment upon residential lots upon a quarter-section line country road for 48-foot 9-inch reinforced concrete pavement capable of carrying heavier volume and tonnage type of traffic, where theretofore it had a 22-foot blacktop pavement amply adequate for abutting residential owners *held,* to constitute a fraud in law upon those property owners, since not only were no benefits conferred but a detriment was sustained by such owners.

---

REFERENCES FOR POINTS IN HEADNOTES

[1]  48 Am Jur, Special or Local Assessments § 21 *et seq.*
[2]  48 Am Jur, Special or Local Assessments § 28.
[3]  48 Am Jur, Special or Local Assessments § 40.

Appeal from Wayne; Baum (Victor J.), J. Submitted October 9, 1959. (Docket No. 50, Calendar No. 48,047.) Decided January 4, 1960.

Bill by R. Ralph Fluckey, Alberta M. Fluckey and others against the City of Plymouth, a municipal corporation, and Charles H. Garlett, city treasurer, to declare void and restrain collection of special assessment for highway expansion. Decree for plaintiffs. Defendants appeal. Affirmed.

*Shirley T. Johnson,* for plaintiffs.

*Harry N. Deyo* (*Miller, Canfield, Paddock & Stone,* of counsel), for defendants.

SMITH, J. The case before us involves the validity of special assessments levied upon certain residential lots owned by the plaintiffs. These lots abut on Sheldon road, in the city of Plymouth. Before the improvements recently made, Sheldon road had a blacktop pavement some 22 feet in width.

In the year 1956 the city of Plymouth annexed a tract of land on the west side of Sheldon road, just south of the Chesapeake & Ohio Railway, and immediately north and west of plaintiffs' properties. Subsequent thereto the Western Electric Company caused to be erected upon this property, so annexed, a substantial structure which will eventually employ several hundred workmen and will be operated as a distribution and repair center for products used by the Michigan Bell Telephone Company.

In the course of the survey made by employees of the Bell Telephone Company for the purpose of determining available truck routes to and from the plant, it was discovered that Sheldon road had been posted with lightweight limitations, and it was felt that such restrictions might seriously impede the

operation of the new plant. Western Electric officials accordingly "reviewed with the city of Plymouth what next step could be taken and what step would be taken, if any, in connection with providing a proper road." A contract was eventually entered into between the city and the board of county road commissioners providing for the construction of a class A road, a 48-foot reinforced concrete pavement 9 inches in thickness, with integral curb and appurtenances, on Sheldon road from Ann Arbor trail to C & O railway.

The cost of the project was estimated at $234,000, of which the city of Plymouth was to pay $80,000 as its share of the expenses. The proper officials of the city then determined that of such sum, 47% thereof should be borne by the city at large and the remainder, or 53%, by the properties fronting on the improvement,* residential properties being assessed at $10 per front foot, side residential lots at $5 per side foot, and commercially and industrially zoned and used properties at $13.69 per front foot, with credits to certain residential property owners of $1.50 per front foot.

We now come to the gist of the action. It was the claim of the plaintiffs that the special assessments so made were for a project not beneficial to their properties, but on the contrary detrimental thereto, and that the special assessments so made were a fraud in law entitling plaintiffs to relief in a court of equity. We are at pains to emphasize, as did the trial court, that no charges of actual fraud on the part of the responsible officials were made or are justified upon the record. In more detail, plaintiffs assert that the conversion of the road in front of their homes from a 22-foot blacktop to a 48-foot reinforced concrete pavement, designed and suitable

---

* These percentages were later modified through the inclusion, for assessment purposes, of 3 lots in the adjacent Springdale subdivision.

for year-round heavy truck traffic, changed Sheldon from a peaceful country road to a "4-lane thoroughfare built to accommodate [and which] is handling, and is attracting truck traffic and car traffic in greater volume," with the result that the value of their properties has been depreciated. The defendants, on the other hand, assert that Sheldon road, being the most westerly of the paved north and south roads in Wayne county, has for some time borne an increasingly heavy burden of traffic, that it is a quarter-section line road, which for years the board of county road commissioners of Wayne county had planned to widen, and, so far as its widening is concerned, that the board has a policy that the paving on all such roads shall be 48 feet in width. In addition, they point out that the new width contributes to safety at street intersections and the railroad, also "in connection with the Nellie Bird School, situated on the west side of Sheldon road," that it eliminates the ditches along the old road, and that the increased width in the pavement lessens dust in the area. In short, that Sheldon road "is no longer a rural highway," but has fallen prey to progress, its widening and strengthening being required "because of general traffic increases and the requirements thereof and for the purposes of safety." The erection of the Western Electric plant, they say, was merely one of the factors. Sooner or later the old Sheldon road would have to go. Moreover, they argue, the determination and apportionment of benefits for special assessments is a legislative function with which the courts should not interfere, at least in the absence of clear proof of fraud, bias, or discrimination, none of which, it is asserted, has been shown in this case.

With much of defendants' argument we are in complete agreement, but much of it is beside the point. It may well be that traffic and industrial conditions in a community justify the conversion of a

sleepy country road into a 4-lane thoroughfare for heavy traffic. In event the change is made in timely response to such demand, the responsible public officials will be commended for their appreciation of the problem and their vigor and foresight in its solution. The congestion of heavy traffic in narrow streets is eliminated, the operations of industry are facilitated, and the community as a whole is benefited.

But does the home owner whose property abuts the new highway receive a special benefit for which he should pay a special assessment? The contrary would seem to be more accurate. Specifically, and in the situation before us the opinion of the trial chancellor goes directly, and correctly, to the heart of the problem in the following words:

"We come, though, to the essential question in the case. Admitting that these commissioners acted honestly and in the very best of faith, could these commissioners have found in the exercise of reason, and I underscore that phrase, in the exercise of reason, at the time they levied the special assessment, that the property specially assessed would receive benefits corresponding more or less to the amounts assessed. I believe not.

"It seems to me that no reasonable person or body could have concluded that the conversion of a 2-lane rural blacktop road, in a high-class residential district, to a 4-lane concrete highway would result in a net benefit to the residential properties abutting it. The east side of Sheldon is zoned 'R-1.' The homesites there constitute very high-grade residential properties. These improved homesites were worth $12,500 to $35,000 when the project was undertaken. Along with the testimony, a view of the project site confirmed to me that many of the parcels are in the $20,000 to $30,000 class. There are young children in the families of many of the residents. It was patent at the outset that the widening

and paving project would diminish rather than enhance the value of the residential property. The project would make possible traffic of a tonnage much heavier than that which could use Sheldon road prior to the improvement. The widening from 2 lanes to 4 lanes was an invitation to a greater volume of traffic which couldn't possibly result in any benefit to residential properties abutting on this road, however much business properties might be benefited."

The chancellor, after examining certain of the testimony adduced, continued as follows:

"It is clear from this testimony that there was a feeling on the part of the commission that any road improvement automatically carries with it special benefit. This was the thrust of the testimony of many of the commissioners. This was also the gist of testimony on the part of a number of other witnesses for the defendants. This idea that road improvements automatically carry with them special benefits to abutting property may have been true once, before communities had installed on a widespread basis impervious road surfaces which could be used easily by automobiles. It was probably safe to say that every time such a surface was installed on a right-of-way, for the first time, the adjacent owners were specially benefited.

"A simple equation of cost and benefit may not have been irrational in those days at the advent of the auto age. But, the order changed. Original paving of a dirt road without any change in its width of, say, 20 feet, may be clearly of special benefit to abutting owners. One cannot say the same about the widening of a road in a residential district and its repavement when the pre-existing impervious hard surface was amply adequate for abutting owners. Our communities, our way of life, have grown and become more complex. Under zoning and deed restrictions, residential islands have evolved."

It was his final conclusion, in brief, that the assessors could not reasonably believe that the improvement of Sheldon road, considered as an overall project, produced a benefit to those specially assessed (over and above the general benefit enjoyed by the community as a whole) or that it increased in value the abutting residential land.   In frontier days, and even today, in some areas, the mere location of a road to or near one's property may confer a real benefit.   This is not such a case.   A road already gave access to the properties.   Again, the paving of a road, eliminating the hazards and annoyances of mud and dust, may also confer a real benefit upon abutting owners.   But again, such is not our case.   The road was already paved.

This is not to say that the adjacent home owners may not be required to pay their share of the cost of this new road in common with all the other taxpayers of the city.   But the theory of the special assessment is that a special benefit has been conferred, over and above that conferred upon the community itself.   Cooley's exposition of the problem*, makes clear the theory of the special assessment:

"The general levy of taxes is understood to exact contributions in return for the general benefits of government, and it promises nothing to the persons taxed, beyond what may be anticipated from an administration of the laws for individual protection and the general public good.   Special assessments, on the other hand, are made upon the assumption that a portion of the community is to be specially and peculiarly benefited, in the enhancement of the value of property peculiarly situated as regards a contemplated expenditure of public funds; and, in addition to the general levy, they demand that special contributions, in consideration of the special benefit, shall be made by the persons receiving it.

* 2 Cooley, Taxation (3d ed), pp 1153, 1154.

The justice of demanding the special contribution is supposed to be evident in the fact that the persons who are to make it, while they are made to bear the cost of a public work, are at the same time to suffer no pecuniary loss thereby; their property being increased in value by the expenditure to an amount at least equal to the sum they are required to pay."

See, also, the discussions of the problem in *City of Detroit* v. *Weil,* 180 Mich 593; *Powers* v. *City of Grand Rapids,* 98 Mich 393; *Long* v. *City of Monroe,* 265 Mich 425, 430 (dissenting opinion); and *New York Central R. Co.* v. *City of Detroit,* 354 Mich 637.

It must be stressed that the facts before us do not involve a mere error in judgment on the part of assessing authorities. We do not trifle with such. Nor do they involve the substitution of the judgment of the court upon the worth of special benefits conferred. The assessors, not the court, weigh the benefits, if, in truth, there are benefits to be weighed. The point here is more fundamental: where, viewed in its entirety, no benefit upon abutting property owners has been conferred by the improvement, but rather a detriment suffered, a special assessment based upon the enhancement of the value of the property is a fraud in law upon such property owners. There has been no enhancement. We are not unaware of such arguments as that the elimination of the formerly existing dirt shoulders would lessen the dust in the area, and that the depressions or ditches along the old road have been filled, but it was the conclusion of the trial chancellor that "the special benefits which are claimed by the city of Plymouth are pretty much afterthoughts." We need not go so far. The doctrine of *de minimis* is fully applicable to alleged benefits conferred by the elimination of problems so nebulous.

We find no error in the proceedings below. Affirmed.   Costs to appellees.

DETHMERS, C. J., and CARR, KELLY, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.