WABEKE v CITY OF HOLLAND

OPINION OF THE COURT

1. APPEAL AND ERROR—EQUITY—REVIEW—DE NOVO REVIEW—FIND-
   INGS OF FACT.

   An appellate court will review *de novo* the record of a suit
   brought in equity, but in doing so will not ordinarily disturb
   findings of fact unless the court concludes that it would have
   arrived at a different result had it been in the position of the
   trial judge.

2. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—STREET IMPROVE-
   MENTS—BENEFIT TO ADJOINING PROPERTY.

   Municipal corporations may levy special assessments upon abut-
   ting property for the purpose of street improvement, based
   upon the theory that a special benefit is conferred upon such
   property over and above the general benefit conferred upon the
   municipality as a whole.

3. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—BENEFIT TO AD-
   JOINING PROPERTY—JUDICIAL REVIEW.

   The legislative body imposing a special assessment for street
   improvement purposes is in the best position to determine
   whether a benefit is conferred upon the property so assessed
   and the amount of such benefit; courts are reluctant to inter-
   fere in such legislative determination unless there is fraud,
   mistake, discrimination or where the absence of the benefits
   claimed appears with certainty.

4. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—BENEFIT TO AD-
   JOINING PROPERTY—JUDICIAL REVIEW.

   The concept that road improvements automatically result in
   special benefits to the abutting properties, even when so deter-
   mined by the legislative body imposing assessments, may be
   overturned where the record as a whole stretches credulity or

REFERENCES FOR POINTS IN HEADNOTES
[1] 5 Am Jur 2d, Appeal and Error § 822.
[2–8] 70 Am Jur 2d, Special or Local Assessments §§ 20, 22, 103, 107.

shows beyond fair dispute that an overall harm results to the property owners assessed.

5. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—BENEFIT TO AD-
JOINING PROPERTY.

A street-widening project purposely designed to maintain the essential residential character of the neighborhood, in which the street would remain two lanes, would only be widened from 22 to 25 feet plus a curb and gutter on each side, only three trees would be removed, and curves and grades would not be eliminated, confers a benefit upon the abutting property owners which would justify a special assessment, where the likelihood that the project would cause the neighborhood to lose its essential residential character is remote.

6. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—INJURY TO PROP-
ERTY—PUBLIC BENEFIT.

Injury that might be suffered by owners of abutting property by reason of a street improvement program would be minimal and insufficient to justify enjoining a assessment of those owners where there would be a loss of shoulder parking, but little shoulder parking is in fact done, where a majority of the homes affected have either turn-around drives or use side-street exits and the others are to be accommodated by curb openings, and where the added width of the street could bring traffic only 1-1/2 feet closer to the residences.

7. MUNICIPAL CORPORATIONS—STREET IMPROVEMENTS—BENEFIT TO AD-
JOINING PROPERTY—PUBLIC BENEFIT.

A special benefit to property owners, over and above the public benefit resulting from a street improvement, appears where the project will eliminate accumulated stormwater, stop the throwing of gravel onto front lawns, eliminate mud and dust, allow the city to sweep and to extend leaf pickup service to the street, and in most cases will actually increase the size of front lawns.

DISSENT BY T. M. BURNS, J.

8. MUNICIPAL CORPORATIONS—SPECIAL ASSESSMENTS—STREET IMPROVE-
MENTS—BENEFIT TO ADJOINING PROPERTY.

*A special assessment should not be levied because of a street improvement project where no special benefits will be conferred upon the residents bordering the street, the hazards of entering the street will be increased, at least two businesses will lose*

*parking space presently used by their customers, air and noise pollution will be increased and moved closer to the homes on the street, and traffic and the speed of traffic will tend to increase.*

Appeal from Ottawa, Harold Van Domelen, J. Submitted Division 3 April 2, 1974, at Grand Rapids. (Docket No. 18076.) Decided June 27, 1974.

Complaint by Paul Wabeke, Cotter Tharin, James Van Putten, Samuel Loewy, and Helen Brockmeier against the City of Holland to enjoin the levy of a special assessment for purposes of street improvements. Injunction granted. Defendant appeals. Reversed.

*James W. Bussard,* for plaintiffs.

*John R. Marquis,* Deputy City Attorney, for defendant.

Before: ALLEN, P. J., and T. M. BURNS and R. L. SMITH,* JJ.

ALLEN, P. J. Plaintiffs, the owners of certain residential lots which abut South Shore Drive in the City of Holland, have challenged the validity of special assessments levied upon them by the City of Holland to help pay for the widening, resurfacing, draining and curbing of South Shore Drive.

Circuit Judge Harold Van Domelen found that the plaintiffs would receive no special benefits from the proposed improvements to South Shore Drive over and above the benefit conferred on the community in general, and permanently enjoined the City of Holland from levying a special assess-

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

ment upon plaintiffs. From that decision, defendant has appealed.

South Shore Drive is a two-lane street commencing at the juncture of 16th and 17th Streets, and generally follows the shoreline of Lake Macatawa. The street surface is blacktop, and averages about 22 feet in width with gravel shoulders. The surface of the street is in generally poor condition, and is characterized by cracks, broken edges and holes. The city plans to install storm sewers, resurface the street to a width of 25 feet, and install curbing and gutter of 1-1/2 feet on each side for a total width of 28 feet, with the intersections flaring to 36 feet. The estimated cost of said project is $741,-000, of which 23% is proposed to be specifically assessed against the property owners at about $10 a front foot. It is estimated that the residents on South Shore Drive generate about 25% to 28% of the traffic thereon. The character of the street is mainly residential, containing homes valued from $15,000 to $100,000. There are also a few small commercial establishments, such as a grocery store, small restaurant, and antique shop.

Plaintiffs argue that while the improvements would be a general benefit to the city and community as a whole, no special benefit would be conferred upon them. They in fact argue that they would suffer a detriment as far as increased traffic hazards, loss of parking space, increased air and noise pollution and a decrease in property values were concerned. Defendant maintained that the road needed the improvement, and that the residents would indeed enjoy special benefits, particularly in the form of better drainage, and asserts that the case falls within the rule of *Axtell v City of Portage,* 32 Mich App 491; 189 NW2d 99 (1971), *app dismissed,* 385 Mich 786 (1972).

Relying upon *Fluckey v City of Plymouth,* 358 Mich 447; 100 NW2d 486 (1960), and *Brill v Grand Rapids,* 383 Mich 216; 174 NW2d 832; 46 ALR 3d 121 (1970), the trial judge found in favor of plaintiffs. According to *Fluckey, supra,* the following rule is applicable to the instant case:

"The point here is more fundamental: where, viewed in its entirety, no benefit upon abutting property owners has been conferred by the improvement, but rather a detriment suffered, a special assessment based upon the enhancement of the value of the property is a fraud in law upon such property owners." 358 Mich 447, 454.

According to 46 ALR3d 127, 135–136, Anno: Widening Street—Special Assessment:

"[M]odern Michigan authority has firmly recognized that a street widening does not necessarily confer a benefit, and indeed may be found in appropriate circumstances to constitute a detriment rendering the collection of a special assessment invalid, especially, though apparently not necessarily, where residential properties are affected."

The issue before us is whether the proposed project is one of the "appropriate circumstances" which invalidates a special assessment. Does the proposed project fall within the rule of *Fluckey* and *Brill* or within *Axtell?* Before answering this question it will be helpful to set forth the standards upon which our decision is based. Recent street widening decisions in *Fluckey, Brill,* and *Axtell,* together with prior case law, offer a basis upon which these standards are formulated.

1. Where the suit is brought in equity the record is reviewed *de novo.* However, an appellate court reviewing *de novo* will not ordinarily disturb findings of fact unless the court concludes it would

have arrived at a different result had it been in the position of the trial judge. *In re Hartman Estate,* 51 Mich App 192, 203–204; 215 NW2d 202, 208 (1974).

2. The power to levy a special assessment for street improvement purposes rests upon the benefit which the assessment confers on the abutting property and which benefit is different from general benefit conferred upon the community at large. 14 McQuillin, Municipal Corporations (3d Ed), § 38.02, p 18. Municipal corporations may levy special assessments based upon the theory that a special benefit over and above the general benefit conferred upon the municipality as a whole, is conferred upon such property. *Axtell v City of Portage, supra.*

3. Whether there is no benefit at all, or the amount of benefit, is peculiarly a decision best made by the legislative body imposing the assessment. Courts are reluctant to interfere in this legislative determination unless there is fraud, mistake, discrimination or where the absence of the benefits claimed appears with certainty. *Frischkorn Investment Co v Detroit,* 257 Mich 546, 552; 241 NW 903 (1932).

4. The concept that road improvements, including street widening in particular, automatically result in special benefits even when so determined by the legislative body, may be overturned where the record as a whole "stretche[s] credulity" or "shows beyond fair dispute" an overall harm to the property owners assessed, *Brill v Grand Rapids,* 383 Mich 216, 220; 174 NW2d 832 (1970). Pavement widenings to double the width of what theretofore had been a quiet residential street and the purpose of which was to provide for fast and heavy motor traffic and where the whole character of the street

and neighborhood is changed are held as a matter of law to confer no special benefit. *Fluckey, supra; Brill, supra.*

Application of these standards leads this Court to conclude the trial court was in error in the present case. We do not agree that the present situation is governed by *Fluckey* and *Brill.* Both of those cases involved doubling the width of the street from two lanes to four lanes, from 22 feet to 44 and 48 feet. Both were connectors leading from a belt highway to the inner city. By contrast, South Shore Drive will remain two lanes, its paved portion to be widened only from its present 22 feet to 25 feet plus 1-1/2 feet curb and gutter on each side and, only indirectly, through 16th Street will connect with a belt highway. The belt highway connection already exists, is not part of the expanded program and lies more than two miles from South Shore Drive with the heart of the city located between. Under these circumstances we cannot conclude with certainty or beyond fair dispute that the modest widening program on South Shore Drive will significantly increase traffic. The scope of the work proposed in the instant case is far less ambitious than in *Axtell,* where in an essentially residential neighborhood a proposal to widen from two lanes to four lanes, regrade, eliminate trees, and install curb, gutter and sewer was found to confer special benefits.

In *Axtell,* a principal factor leading the court to conclude the special assessment was proper was the remote likelihood that the project would cause the neighborhood to lose its essential residential character.

"The Michigan Supreme Court has held that the widening of a residential street into a four-lane main artery would not confer the type of benefit which would

subject the abutting owners to a special assessment.
*Brill v City of Grand Rapids,* 383 Mich 216; 174 NW2d
832; 46 ALR3d 121 (1970); *Fluckey v City of Plymouth,*
358 Mich 447; 100 NW2d 486 (1960). However, both of
the Supreme Court cases cited dealt with the situation
where a residential street was converted, more or less,
into a highway. The whole character of the street and
the neighborhoods had been changed as a result of the
improvements, causing a great deal of deterioration in
the quality of life experienced by abutting land own-
ers." 32 Mich App 491, 495.

The South Shore Drive widening is purposely de-
signed to maintain the esthetics and present char-
acter of the neighborhood. An earlier proposal to
widen South Shore Drive to four lanes, eliminate
its curves, remove 58 trees, and level dips and
valleys in the roadway was rejected in 1969 by the
mayor and council following a public hearing. A
new and less ambitious program was then devel-
oped to maintain the essential character of the
street, widen to two lanes, tear down three trees,
and leave untouched the present curves and grade.
Following public hearings it was approved by the
city council and is the proposal in litigation before
us. As to the change in policy brought about by
the public hearings on the original proposal, we
quote the testimony of the mayor:

"*Q.* Did the comments you heard at these hearings
affect your judgment in that respect?

"*A.* I would say those are the only reasons I changed
my opinion. This is, as I stated before, a feeder road
and granted it serves South Shore Drive, it also serves
the area north and south of South Shore Drive as well
as the dead-end area at Lake Michigan, but *I felt this
was a unique road and there are others in our commu-
nity, and the people actually convinced me to keep that
character.* We dropped from 58 trees down to 3 trees in
the proposed project. We are going to keep the curves
in the road. There is only a couple of bad safety spots

which we'll still have to cut down the tops for clear view areas, but *basically we are trying to keep the character, the intent of the present road."* (Emphasis supplied.)

The trial court further found that in certain respects plaintiffs would suffer injury by reason of the street program. Specifically, he cited 1) the elimination of shoulder parking; 2) the increased difficulty of backing out of a driveway; 3) the movement of traffic closer to homes; 4) added volume of traffic; 5) increased speed; 6) loss of parking spaces in front of certain commercial establishments. Based upon our review *de novo* of the record we cannot agree as to the first three findings. On the remaining three we agree with the facts but disagree as to the weight to be given thereto.

Car counts taken along the entire 1.7 mile stretch disclosed that during daylight there were from 1 to 3 cars parked. Nighttime counts found 1.05 to 2.94 cars parked. This count was not rebutted. We find it *de minimis* and insufficient to justify injunction. Likewise, a survey of residences abutting on South Shore Drive indicated that of some 134 to 149 homes, 94 either had turn-around drives or used a side street as an exit. 39 had no way to turn a car about. To accommodate these residents the approved plans called for a ten-foot curb and gutter opening at each driveway plus an additional ten feet on each side. This will allow 30 feet of uncurbed entrance which should permit continuance of the former practice of maneuvering a vehicle parallel to the street before exit. As to the finding that traffic was moved closer to residences we observe that it is but 1-1/2 feet of paved surface and is all within the existing city right of way. Further, the record discloses that of the five

residential owners who testified for plaintiffs, four
would in fact receive an increase in front yard
area. Installation of curb would prevent vehicles
from driving on the shoulder with the result that
for most residents the allowable traveled portion
of the roadway will be further distant from the
home than now.

Keeping in mind the standards of review men-
tioned earlier, does it appear with certainty or
beyond fair dispute that there is not a special
benefit accruing to the abutting property owners
as distinguished from a general benefit to the
community? Obviously there is a public benefit in
the smoother surface, the wider two lanes and the
addition of turn lanes at intersections. These are
benefits which abutting property owners will share
in common with other motorists. But we also find
a special benefit over and above these benefits. The
record is replete with testimony that stormwater
and debris now collects along the road shoulder
and runs onto private property, that many prop-
erty owners complain about stones and gravel
thrown onto their lawns, that the absence of curb
makes it impossible to sweep the street as is done
by the city in other residential areas, that home-
owners are placed in danger by oncoming traffic
which swerves onto the gravel shoulders, and that
dust from the shoulders is a nuisance. Multiple
photographs were introduced depicting frequent
and unattractive pools of water, mud and mire
along the roadbed and front yards. The proposed
project will eliminate the accumulated stormwa-
ter, stop the throwing of gravel onto front lawns,
eliminate mud and dust, and enable the city to
sweep and extend leaf pickup service to the street.
Importantly, for most homeowners, curb installa-

tion will actually increase the lawn size. The esthetics of the area will be improved and made consistent with other subdivisions in the city.

Abutting property owners are not charged for the entire cost of the proposed improvement but only for 23% thereof, with the balance to be spread against the city as a whole. This appears reasonable since the record shows that residents of South Shore Drive contribute from 25% to 28% of the traffic thereon. This Court is aware that the area involved in litigation contains some of the choicest site locations in the city. Rejection of the proposed special assessment will have the result of having other citizens in the community pay for the entire improvement. The property owners on South Shore Drive will receive without charge pavement, storm sewer, curb, and gutter for which residents in other parts of the city must pay either in full or the major cost thereof. In the past 20 years some 90 paving projects had been specially assessed by the city including 11 streets designated major.

Our decision in this case is not to be construed as holding that under no circumstances may a street widening of no more than two lanes be found to confer no special benefit or that the legislative body's determination of benefit in such instances shall remain inviolate. We conclude only that based on the extensive record in this case there is insufficient evidence to overturn the determination of special benefit made by the governing body of the city. The absence of benefits claimed does not appear with certainty. Overall harm to the property owner assessed is not shown beyond fair dispute.

Reversed. No costs allowed, a public question being involved.

R. L. SMITH, J., concurred.

T. M. BURNS, J. *(dissenting)*. I cannot agree with the majority's view that the residents on South Shore Drive will receive special benefits from the proposed improvements over and above those conferred on the community in general.

In order to levy a valid special assessment for a public improvement, there must be a special benefit conferred upon the property assessed over and above that conferred upon the community itself. *Brill v City of Grand Rapids,* 383 Mich 216; 174 NW2d 832 (1970); *Fluckey v City of Plymouth,* 358 Mich 447; 100 NW2d 486 (1960).

In this case the trial court found that the amount of traffic on the street in question makes it practical for the residents to back out of their drives onto the shoulders in order to gain a safer entrance to a traffic lane. These shoulders are used for parking by adjacent residents. The purpose of improving the street is to facilitate the movement of traffic over it. However, while the widening, resurfacing and general improvement of the street will attract more use, the trial court found that such increased use will also increase the hazards in getting on and off the street for its residents. The installation of curbs and gutters will eliminate the present practice of backing out of drives onto the shoulders before entering a traffic lane, thus increasing the danger of entering the street. At least two businesses will be adversely affected by the elimination of presently used parking space for their customers. Furthermore air and noise pollution will be increased and moved closer to the homes on this street. The proposed improvements will tend to increase traffic and its speed which will not be beneficial to the abutting owners but more likely than not will be detrimental to residential property.

These are the factors upon which the trial court

based its conclusion that the residents on South Shore Drive will receive no special benefits from the proposed improvements.

In the recent case of *In re Hartman Estate,* 51 Mich App 192, 203–204; 215 NW2d 202 (1974), we explained our duty in regard to reviewing equity cases *de novo* when we quoted from our Supreme Court's decision in *Biske v City of Troy,* 381 Mich 611, 613–614; 166 NW2d 453, 455 (1969):

> " ' "We hear and consider chancery cases de novo on the record on appeal. *Johnson v Johnson,* 363 Mich 354; 109 NW2d 813 (1961); *Osten-Sacken v Steiner,* 356 Mich 468; 97 NW2d 37 (1959); *Futernick v Cutler,* 356 Mich 33; 95 NW2d 838 (1959); *A&C Engineering Co v Atherholt,* 355 Mich 677; 95 NW2d 871 (1959); *Straith v Straith,* 355 Mich 267; 93 NW2d 893 (1959); *Ball v Sweeney,* 354 Mich 616; 93 NW2d 298 (1958). This Court, however, is inclined to give considerable weight to the findings of the trial judge in equity cases. This is primarily because the trial judge is in a better position to test the credibility of the witnesses by observing them in court and hearing them testify than is an appellate court which has no such opportunity. We do not ordinarily disturb the findings of the trial judge in an equity case unless, after such an examination of the entire record, we reach the conclusion we would have arrived at a different result had we been in the position of the trial judge." ' *Christine Building Co v City of Troy,* 367 Mich 508, 517–518; 116 NW2d 816, 820 (1962)."

In considering this equity cause *de novo* according to the rule enunciated above, this writer agrees with the trial court's decision that the residents bordering on South Shore Drive will receive no special benefits from the proposed improvements to South Shore Drive over and above that conferred on the community in general.

Accordingly, I would affirm the trial court's judgment permanently enjoining the defendant from levying a special assessment.