# APRIL TERM, 1888.

CATHARINE M. WHITNEY ET AL V. THE COMMON COUNCIL
OF THE VILLAGE OF HUDSON AND HARRY C.
KINNE, RECORDER.

[See 50 Mich. 86; 53 Id. 158.]

*Municipal corporations—Local assessments—Taxing district—Bid
for making improvement—Ordinances and by-laws—Com-
mon council—Vote—Reconsideration.*

1. Grants of power to make local assessments are strictly construed,
   and must be strictly followed, and the action of the common
   council must be within the power conferred, and when the mode
   (of its exercise) is prescribed, either by charter or ordinance, *that*
   mode constitutes the measure of the power.

2. The charter of a village whose common council is composed of the
   president and six trustees, and which provides that in proceed-
   ings of the council *each* member present shall have *one* vote, and
   when there shall be a tie the president shall give the *casting* vote,
   makes the president a voter upon *every* question, and, in the case
   of a tie, he has an *additional* vote.

3. Under a village charter which prohibits the common council—
   composed of the president and six trustees—from ordering any
   tax or assessment except by a two-thirds vote of the members of
   the council, a vote of *five* members is required for such purpose.

4. The common council of a village, under a charter provision empow-
   ering them to specify a taxing district benefited by an improve-
   ment for which a special assessment is to be made, must define
   and establish a *definite* district, and cannot delegate this power to
   the assessor or any other person.

5. Where a resolution for paving a street was adopted by the com-
   mon council of a village, and afterwards reconsidered, and not
   again passed, *after* proceedings under said resolution are invalid.

6. While strict parliamentary rules should not be applied to munici-
   pal bodies exercising legislative functions, and where they adopt

or pursue a method of procedure understood by themselves, which arrives at substantial results, their action should not be overthrown upon any technical rules or strict construction of parliamentary law, it is *not* competent for the *individuals* who composed such body to give evidence of what they *understood* was the effect of the action which the *record* shows was taken, which must be gathered from the *whole* record of their proceedings, from which must be determined whether *what* they did, or omitted to do, was essential to the validity of the proceedings.

7. Where by statute a vote of two-thirds of the members of a common council is required to pass a resolution, a like vote is required to reconsider or rescind it, in the absence of a contrary rule of the council regulating the practice upon motions for reconsideration.

8. A common council of a village have no authority to award a contract for a local improvement to "Hubbard Smith" individually, upon a bid made by "Hubbard Smith & Son."

9. Where a village ordinance required that the record of the common council should show, as the basis for a valid assessment, that there was a bidder for the performance of a local improvement whose bid was accepted, an assessment made without such record is a nullity.

Appeal from Lenawee. (Howell, J.) Argued January 5 and 6, 1888. Decided April 6, 1888.

Bill filed to have certain assessments for street-paving purposes declared void, and to restrain a sale of property therefor. Decree dismissing bill reversed, and one entered declaring the assessments, and all proceedings, deeds, and conveyances based thereon, void as to complainants. The facts are stated in the opinion.

*Millard, Weaver & Weaver,* for complainants.

*V. H. Lane,* for defendants.

CHAMPLIN, J. The common council of the village of Hudson is composed of the president of the village and six trustees.

The charter of the village provides that—

" The president and trustees, when assembled and duly

organized, shall constitute the common council of the village of Hudson, and a majority of the whole shall be necessary to constitute a quorum for the transaction of business, though a less number may adjourn the council from time to time ; but no tax or assessment shall be ordered   \*   \*   \* except by a vote of two-thirds of the members of the common council."  2 Sess. Laws of 1867, Act No. 266, § 28.·

Section 30 of the act provides that—

" In the proceedings of the common council each member present shall have one vote, and, when there shall be a tie, the president shall give the casting vote;   \*   \*   and such vote shall be so entered in relation to the adoption of any resolution or ordinance, report of committee, or other act for taxing or assessing any property in said village, or the citizens of said village."

Section 31 enacts that the common council shall prescribe the rules for its proceedings, and they are given power to manage, control, and supervise the highways and streets in the village, and to enact ordinances to grade, gravel, pave, and improve the streets of the village.  Sec. 31, subd. 31.

They are given power by section 38 to assess and levy at any time, by special tax, the expense of making, grading, paving, and repairing streets, upon the lots, premises, and subdivisions thereof which are in front of or adjoining to such streets, and upon other lots or premises which in the opinion of the common council are benefited thereby, and to make all by-laws and ordinances relative to the mode of assessing, levying, and collecting any such tax, which shall be and remain a lien upon the land until paid, and if not paid the land may be sold therefor in the same manner as for ordinary village taxes.

An ordinance of said village, passed on the nineteenth day of March, 1878, reads as follows :

"AN ORDINANCE RELATIVE TO PAVING STREETS.

" Section 1. The common council of the village of Hudson ordain that whenever said common council shall, by resolution entered in its journal, determine that it is expedient to

pave any of the streets of said village outside of the sidewalks thereof, they shall, in the same resolution, designate what property shall be assessed for the purpose of defraying the expenses of said paving; which property, so designated, shall constitute the taxing district for such paving purposes, and the expense of constructing such pavement, and furnishing materials therefor, shall be assessed thereon.

" Sec. 2. Whenever any such resolution shall have been adopted by said common council, it shall be the duty of the committee on streets to immediately advertise for proposals to furnish the materials, and construct such pavement; and such advertisement shall contain concise specifications of the kind of materials to be used, and the quantity and quality of work to be done. All bids received shall be reported to the common council, and the contract for such paving, and furnishing materials therefor, shall be let to the lowest bidder therefor, who shall give sufficient security for the performance thereof: *Provided*, however, that said common council shall have the right to reject any and all bids, if, in their opinion, the interest of said village will be best served by so doing.

" Sec. 3. If the bid so accepted shall be for the work and materials by the square foot or square yard, the common council shall at once proceed to have said street or streets proposed to be paved, measured, and the contents thereof computed according to the standard mentioned in said bid, of which measurement and computation said contractor shall have at least two days' notice; and upon the basis of such measurement and computation the cost of said paving and materials shall be computed, according to the terms of said bid so accepted by the common council.

" Sec. 4. The aggregate cost of such paving and materials, so ascertained as aforesaid, shall be deemed the amount necessary to be raised for the purpose of defraying the expenses of such paving and materials; and immediately upon its being so ascertained, or, if the bid is for a sum in gross, immediately after the making of the contract, the assessor of said village shall proceed to apportion the same to the real estate situated in such taxation district, in proportion to the benefits derived to said property from said paving, which shall be deemed to be in proportion to the number of feet said real estate shall front, adjoin, or abut onto any street determined to be paved aforesaid.

" Sec. 5. Said apportionment, when so made as aforesaid, shall be filed with the recorder of said village. Said recorder

shall give notice by publication in the official paper of said village of the filing of said apportionment, and that at the meeting of said common council then next to be held said apportionment will be open for review and correction, on the application of any person interested who may consider himself aggrieved thereby; and, upon such application so made, it shall be lawful for the common council to make such alterations and amendments as shall in their judgment be just and equitable.

"Sec. 6. Such apportionment, made, reviewed, and corrected as aforesaid, shall be a special tax on the property therein described, and shall be spread upon the assessment roll of said village then next afterwards to be made, opposite to the description of said property on said tax-roll, in a separate column, marked 'Paving tax,' and shall be collected in the same manner as ordinary village taxes, and when so collected, and paid into the village treasury, shall be and remain a separate fund for the purpose for which it was assessed and collected; and said tax shall be and remain a lien upon the land to which it is assessed until paid, and, if not paid, the land may be sold therefor in the same manner as for ordinary village taxes."

On the fifth day of April, 1882, the common council passed a resolution determining that it was expedient and necessary to pave Main street 15 feet in width on each side of the center line, from the east line of Howard street, west to the west line of village lot No. 3, on block No. 2 of Cobb's addition to the village of Hudson, and to excavate and grade said street within said limits sufficiently to prepare for the paving of the street; that said street should be paved with cobblestone, and the grading thereof should be gravel.  The resolution declared—

"That the real estate abutting or joining the said street to be excavated, graveled, and paved shall constitute the taxation district for such paving purposes, and the expenses of constructing such pavement, and furnishing materials therefor, shall be assessed thereon; that all the expenses of grading said Main street, preparatory to paving the same, shall be paid out of the general fund of said village, which shall be deemed the proportion of said expenses proper to be paid by general tax."

69 MICH.—13.

On April 17, 1882, said resolution was amended so as to read, "17 feet from the center each way," in place of 15 feet; making a pavement 34 feet wide, instead of 30 feet wide.

On the nineteenth day of April, 1882, the street committee inserted an advertisement in the village paper headed, "To Contractors," and setting out that the common council had determined to pave Main street 17 feet wide on each side of the center, from the east line of Howard street to the west line of village lot No. 3, on block No. 2, to Cobb's addition to the village of Hudson, with cobble-stone, on a bed of clean, coarse sand or gravel,—the whole, when completed, exclusive of top covering, to be 14 inches in thickness; the work and material to be, in all respects, similar to the paving on Main street in said village,—and inviting proposals for furnishing the materials, and doing the work; specifying how the bids should be made, and stating that they must be filed with the recorder of the village up to and including May 1, 1882; requiring a deposit of $100 to accompany each bid, as a guaranty that, if the bid should be accepted, the bidder would enter into a contract, and secure the performance thereof; stating when the work should be commenced, and when completed, and when payments would be made; stating also, that the council reserved the right to reject any and all bids.

No other notice was given, or bids invited, except that on April 28, the notice was changed so as to include the changes noticed below in the resolution of April 24. On April 24, 1882, a new resolution to pave Main street was introduced and adopted. Whether it was intended as an original resolution, superseding the other, or as an amendment of it, is somewhat doubtful. The record reads:

"Trustee Lane moved that the following resolution to pave Main street be adopted as amended."

The difference is material.   While covering the whole ground of the former resolution, it extends the distance to be paved west to a line 33 feet west of the east line of Oak street, in the village of Hudson.   It also contains an additional clause as follows:

" That the whole pavement, when completed, shall be fourteen inches in thickness, exclusive of top covering, and the work and materal shall be similar in all respects to the paving on Main street, in said village."

The language with respect to the property to be assessed is the same as that contained in the former resolution.   This change becomes more important when we come to consider what was claimed to have been done in letting the contract for the work.

The record shows a bid for the work dated April 19, 1882, signed, "Hubbard Smith & Son," which reads:

" I hereby propose to do the laying and furnishing of the pavement on West Main street, East Main street, and Railroad street, according to the specifications published, at 15 cents per square yard, and complete the same in a workmanlike manner, to the satisfaction of the council.

" *Hudson, April* 19, 1882.     HUBBARD SMITH & SON."

The council awarded the job of paving to Hubbard Smith, but it seems that it merely included the laying of the pavement, and not the furnishing of the cobble-stone material therefor.   The furnishing of the cobble-stone was awarded to one Vanakin for 34 cents per square yard.   The work of excavating and filling was also awarded to him.

The council ascertained the expense of paving by taking the whole distance to be paved under the resolution of April 24, for which no bid was received, and the lots were measured, and the expense apportioned and laid according to the number of feet of the abutting property fronting on the street. This was done by the assessor, and reported to the common council under date of the twenty-fifth of May, 1882.

Previous thereto, and at the meeting of the common coun-

cil held on the first day of May, 1882, a remonstrance, signed by 57 citizens of Hudson, was presented to the council, remonstrating against the construction of the cobble-stone pavement, and representing that such pavement was against the wishes of the lot-owners and residents on the street to be paved. It was referred to a committee, and the chairman thereof, on the fifteenth of May, reported, recommending that the street be graveled, instead of paved. The majority of the committee made no report. The report made was accepted, and laid on the table. Protest was also made against the tax as assessed. The council proceeded, however, to make the improvement.

Their action was contested by many of the persons assessed. One of the complainants, in the first instance, sued out a writ of *certiorari* to the Supreme Court, and this Court held that it was not the proper remedy. Then, the recorder refusing to sell the lands for the non-payment of the assessments, the village applied to this Court for a *mandamus,* and we held that he had no discretion, and was not the proper tribunal to decide the rights of the parties. These cases are reported in 50 Mich. 86, *Whitbeck v. Common Council* (14 N. W. Rep. 708), and 53 Mich. 158, *Common Council v. Whitney* (18 N. W. Rep. 626). The complainants then filed this bill to have the assessments declared void, and to restrain the sale. Many illegalities and irregularities are alleged.

The authority delegated by the Legislature to the common council of the village of Hudson relative to grading, paving, and other improvement of streets, and the defraying the expenses thereof, is very general in terms. It is contained in sections 31 and 38 above quoted. There is also authority conferred by section 39 to compel owners of abutting lands to pave in front of their premises to the center of the street; but these proceedings were not undertaken under that section.

The power conferred upon the municipality is a very

important one, involving not only the power to tax, but leaving it with the common council to prescribe, by by-law or ordinance, the mode of assessing, levying, and collecting such tax. Usually, in conferring such power upon municipalities, the Legislature has itself enacted the rule by which such assessments should be apportioned; but in this case the whole matter has been confided to the common council. Acting under this authority, the common council passed the ordinance above set forth, by which, in connection with the charter, we are to determine the legality of the assessments complained of. The questions presented naturally divide themselves into three inquiries:

1. Have the requirements of the charter been observed in the proceedings which form the basis of the assessment?

2. Have the provisions of the ordinance been observed in such proceedings?

3. If there has been a disregard of either charter or ordinance, were the violations of such nature as to affect the validity of the assessments?

The principles which underlie the consideration of these questions are well established, namely: That the action of the common council must be within the power conferred, and when the mode is prescribed, either by charter or ordinance, that mode constitutes the measure of the power; that grants of power to make local assessments are strictly construed, and must be strictly followed.

The charter prohibits the common council from ordering any tax or assessment except by a two-thirds vote of the members of the common council. There are seven members of the common council,—a president and six trustees. Section 28, *supra.* It consequently requires, under the provision of this charter, a vote of five members to order any tax or assessment. If the language of the law was to expressly or impliedly limit the right of the president to vote only in cases of a tie, then, as there could be no tie in a two-thirds vote, the construction

would prevail that two-thirds of the trustees could order a tax or assessment.

The charter, however, expressly says that,—

" In the proceedings of the common council, each member present shall have one vote, and, when there shall be a tie, the president shall give the casting vote."

This makes the president a voter upon every question, and, in case of tie, he has an additional vote. It is unlike the cases cited in *Mills v. Gleason*, 11 Wis. 496, of the President of the United States Senate, or the lieutenant governor of a state, as part of the senate. These are merely presiding officers, who can vote only in case of a tie. It is analogous to the speaker of the house, or chairman of the board of supervisors, who are voting members of the body, and are entitled to vote on any question as a member of the body.

The resolutions of April 5 and 24, above referred to, appear to have been passed by the requisite two-thirds vote of the common council. These resolutions described the improvement determined upon, and that the expense thereof, except the grading of the street to prepare for the paving, should be assessed upon the real estate abutting or adjoining on the street to be graded or paved, which should constitute the taxing district for such paving purpose. The necessity of specifying a taxing district which the common council deems benefited by the improvement is required by the charter, which grants to the common council power to assess and levy the expenses of making the improvement—

"Upon the lots, premises, and subdivisions thereof which are in front of or adjoining to such streets to be improved, and upon other lots and premises which, in the opinion of the common council, are benefited thereby."

The council are not confined to the abutting property, or to the same street, even, but it must declare a district which it deems benefited. The fault of these resolutions is—for they are both the same in respect to the district to be assessed

—that they do not define any district. Main street extends quite a distance, both east and west of the portion which the council determined to pave. Does the district include all of the real estate abutting upon the street, a portion of which had already been paved? That the district assessed is not confined to the distance paved is alleged in the bill, admitted in the answer, and stipulated to be a fact in the case. It is also charged and admitted that the district assessed includes lands which do not adjoin or abut upon the street. Manifestly, such land is not included in the resolutions.

Had all the real estate abutting on the street been platted into village lots, and the plat recorded, and had the resolution described the real estate to be assessed as all the lots, and parts of lots, fronting on or abutting on the street between certain points, according to the recorded plat, it would have definitely defined a district to be taxed. But where land is not known or designated according to some plat, it cannot be very definitely described or included in a district without specifying some line or boundary other than that of the street line upon which it fronts or abuts. The district must be defined and established by the common council, and not by the assessor or other person. This is a power that cannot be delegated by the council.

In this case there was no district to be assessed fixed or determined upon until the assessor made one, and presented it to the common council on the tenth day of July, 1882. This contained lands fronting or abutting on Main street, and described in some instances as lots according to plat, but more generally by metes and bounds, one bound of which, with the exceptions noted above, was Main street; and the north and south lines of the district were not bounded by a line uniformly distant from Main street, but by lands owned by other parties, whether nearer or more remote from Main street. Under the statute authorizing the expense to be

apportioned, the assessment is made against, and is a charge upon, the land included in the taxing district; and hence the necessity of specifying a definite district, whose boundaries are fixed by the common council. This is required for the benefit and protection of the owner and others having interests in the lands, and to enable the assessing officer to lay the burthen upon the district designated, in the proportion established by law. The assessment, when laid, becomes a lien upon the land, and it is of prime consequence to the owner to be informed of the extent to which this lien covers and incumbers his premises; and it is important, also, to a purchaser at the sale for unpaid assessments, to know what he is purchasing.

None of these requisites are apparent in a resolution which describes real estate as simply fronting or abutting upon a certain street, without regard to depth. Had the resolution described the district as all the real estate embraced in the deeds of the respective owners which front or abut on Main street, it would, at least, have embraced a district which, however indefinite upon the face of the resolution, could have been made certain by reference to the title deeds. As it is, the resolution contains no district of land upon which the assessment is to be made.

On July 6, 1882, the answer states the assessor filed with the recorder an assessment made by him upon certain lands. It bears date May 25, and was laid before the common council July 10, 1882. This assessment contains five headings. Under the first is entered the name of the owner or occupant; and in the second, the description of real estate, opposite the name of owner or occupant; the third contains the number of feet front; the fourth, the tax per foot, which is stated uniformly at $1.3134; and the fifth contains the amount of tax set opposite each description.

After making certain corrections in the roll, upon appeal made after public notice of the time and place of hearing, the

common council on the thirteenth of July, 1882, by resolution, instructed the village assessor to prepare the roll, and report the tax to the common council; and on the twenty-fourth day of July, 1882, the assessor reported the tax-roll of the village, including the special assessment for paving Main street, and the common council, by resolution, accepted the tax-roll, and declared it the tax-roll of the village, and directed the necessary warrant for its collection, to be annexed to the roll.

Both of these resolutions were resolutions ordering taxes and assessments, and required a two-thirds vote of the members of the common council to pass them. There were but four votes in favor of either of the resolutions, when the charter required five. The assessment, therefore, was invalid.

It is alleged, as ground for relief, that the assessment was made without any resolution in force determining that it was expedient to pave Main street, and designating what property should be assessed, as required by section 1 of the ordinance above quoted.

After passing the original resolution of April 5, and the amendatory resolution of April 17, 1882, the common council on the first day of May, 1882, reconsidered the vote of April 24, 1882, adopting the resolution by a vote of three in favor, and two against. A motion was then made that the resolution to pave West Main street be rescinded; which was lost by a vote of two in favor, and three against, the motion. No vote was ever afterwards taken to pass or adopt the resolution of April 24, but the council proceeded as if it had never been reconsidered. This resolution lay at the foundation of the whole proceedings to pave Main street; and if it was reconsidered, and not afterwards passed, the proceedings to assess the expense must fail for that reason.

Counsel for defendants insists that strict parliamentary rules should not be applied to these municipal bodies exercising legislative functions; that if they adopt or pursue a

method of proceeding understood by themselves, which arrives at substantial results, their action should not be overthrown upon any technical rules or strict construction of parliamentary law. We are of the same opinion. We do not think it competent, however, for the individuals who composed the legislative body to give evidence of what they understood was the effect of the action which the record shows they took. This must be gathered from the whole record of their proceedings, and from this determined whether what they did, or omitted to do, was essential to the validity of the proceedings.

It is claimed, also, by the defendants' counsel, that the vote to reconsider was not carried; that where, by statute, a vote of two-thirds is required to pass a resolution, it cannot be reconsidered or rescinded except by a two-thirds vote. This was declared to be the law in the case of *Stockdale v. School-dist.*, 47 Mich. 226 (10 N. W. Rep. 349), where the motion was to rescind. And, where the body has adopted no rule regulating the practice upon motions for reconsideration, it is not perceived why the same ruling should not apply.

The law requires a vote of two-thirds of the members of the body to pass the act in the shape it is in when the vote is taken. Two-thirds are satisfied with it as it then reads, and no reason exists why a majority less than two-thirds can bring the resolution again before the body for the purpose of changing its features, or postponing action. There should be some stability in legislative action which is passed under the requirements of a law calling for a vote of two-thirds of its members, and it should remain as the two-thirds have passed it, unless the same number desire a further consideration of the measure.

We think that the charges made in the complaint that the action of the common council in awarding the bid to do the work to Hubbard Smith was a pretense and a sham are made

out by the proofs.  The bid, a copy of which has been given above, bears date April 19, 1882.  It is signed, "Hubbard Smith & Son."  Hubbard Smith and his son were contractors, residing in Detroit.  They were in partnership, and in 1882 had a contract at St. Clair, Michigan.  Hubbard Smith is dead, but his son was sworn as a witness, and testified that they had no contract for paving in the village of Hudson in 1882; that he never heard his father mention such a job; that he had no knowledge of his father or the firm ever receiving any pay for such a job.  The bid itself appears to be in the handwriting of the president of the village, and the signature in that of Hubbard Smith, who appears to have been at the village of Hudson at or just prior to its date.  He had previously done a job of paving for the village.

The bid, if intended as genuine, must have had reference to the paving proposed to be done under the resolution of April 5, and under the advertisement to contractors dated April 19, 1882.  The president of the village testifies that it was produced by the recorder to the council at its meeting of May 1, 1882, and he thinks it was sent to him by Mr. Smith.  No deposit was made, as required by the notice to the contractors, as a guaranty that, if the bid was accepted, he would enter into a contract, and secure the performance thereof.  He had put in no bid in his individual name, and the council did not accept the bid of Hubbard Smith & Son, which it is claimed he did put in.  The bid of Hubbard Smith & Son is not shown to have been the lowest; indeed, it does not appear that there were any other received or laid before the council.

It is important to note that the bid expressly referred to, and offered to do the paving "according to the specifications published;" and those published were those contained in the notice published of date the nineteenth of April.  The bid, when accepted, became, under the ordinance, the basis of the amount which the council were authorized to assess for the

expense of the improvement. If, under this bid of Hubbard Smith & Son, the pavement only extended to the west line of village lot No. 3 on block 2 of Cobb's addition, the council had no authority to assess the expense of paving to a line 33 feet west of the east line of Oak street. When a bid is accepted which offers to do the work by the square yard, a measurement is then to be made by the common council, of which the contractor is to have two days' notice. No notice appears to have been given either Hubbard Smith or the firm of Hubbard Smith & Son. No contract was ever entered into between Hubbard Smith and the city. He never came near the work, and neither did nor procured it to be done.

One Enos Caniff, who was a "street commissioner" of the village, after the action of the council awarding the contract to Hubbard Smith, went to the city of Detroit, and there employed George Hare to do the whole job of paving ordered by the common council for the year 1882 in the village of Hudson. He made a contract with Hare to do the whole work for seven cents a square yard; and Hare did the work, and received his pay through Caniff. Hubbard Smith had nothing to do with the job, nor with making the contract, nor with paying Hare therefor. Here was eight cents a square yard profit that went into some one's pocket, and it does not appear that it was paid to Hubbard Smith or Hubbard Smith & Son.

Enos Caniff was sworn as a witness for defendants, and a careful examination of his testimony convinces us that his interview and the paper which he obtained from Hubbard Smith were merely colorable, and obtained to cover up the illegal method of making this so-called improvement. It appears that Hubbard Smith, after signing the name of Hubbard Smith & Son to the bid of April 19, paid no more attention to the matter. Caniff testifies that in the summer he went to St. Clair, Michigan, and saw Hubbard Smith, and wrote out a paper, a portion of which he claims Smith dictated, but

does not state what portion, and obtained Smith's signature thereto, as follows, viz. :

 St. Clair, Mich., July 19, 1882.

" *To the Common Council of the Village of Hudson:*

" I hereby authorize and empower Enos Caniff to take charge of my men, and supervise the paving of West Main street, in the village of Hudson, under my contract with you to do said work, as it is impossible for me or·my partner to come. And I hereby also authorize and request your honorable body to pay my men, while doing such paving, every Saturday night, for what they have done, not exceeding the contract price of 15 cents per superficial yard, and charge the same to my account under my contract, as I have always been in the habit of paying them every Saturday night.

" Yours, etc.,

" Witness:   I. P. Worden.        Hubbard Smith."

It is apparent upon th e face of thisaper that there was a fraud or imposition being practiced by some one in relation to the paving of this street. Caniff testifies that he presented this paper to the common council. At that time no paving had been done on Main street, although Caniff had been doing the paving on Railroad street. I cannot see how, under all the circumstances, it can be said that the common council were acting in good faith, in accordance with the charter and ordinances. The council must have known that they had no authority to award the job of paving Main street to Hubbard Smith individually, upon a bid made by Hubbard Smith & Son. The law required them to let the contract to the lowest bidder, reserving the right to reject all bids. The law did not give them the right to award the contract to a person who had not bid; and passing a resolution by a vote of three for, and two against, to do so, did not raise contract relations with such third person. The council knew, when the paper signed by Hubbard Smith was laid before them; that he had no contract with the common council to do the work. The object of such paper was to let Caniff do the work at a profit of eight cents a square yard, or

more than twice its cost, for which complainants, among others, were taxed.

Caniff claims that, acting under this authority, he hired or contracted with Mr. Hare; and, acting under the same authority, the common council allowed and paid Enos Caniff, agent of Hubbard Smith, for such paving, at 15 cents a square yard. The following questions put by counsel for defendants to this witness, and his answers thereto, are significant:

" Q. What arrangement was made between yourself and Mr. Smith as to your compensation?

" A. As I was restricted here, that my compensation and the whole should not cost but so much per yard.

" Q. What was that amount?

" A. Fifteen cents, according to his bid and contract."

This shows that Smith had no interest in the matter. Seven cents a square yard was paid to Hare for laying the pavement, and eight cents went to Caniff. The record does not show that there was any bidder whose bid was accepted; and as this was essential, under the ordinance, as a basis for a valid assessment, such assessment was a nullity.

These complainants were materially and injuriously affected by the illegalities complained of and pointed out. They have not lost their rights by laches, and a decree must be entered reversing the decree of the court below, and declaring the assessments, and all proceedings, deeds, and conveyances based thereon, void, and of no effect, so far as complainants are concerned.

The complainants will recover costs of both courts.

SHERWOOD, C. J., MORSE and LONG, JJ., concurred. CAMPBELL, J., did not sit.