SMITH v. CITY OF GARDEN CITY.

1. MUNICIPAL CORPORATIONS — CHARTERS — PUBLIC IMPROVEMENTS — SPECIAL ASSESSMENT.

City charter provisions that special assessments for a public improvement may be imposed on the owners of the land *to be benefited* thereby *after* the city council shall cause the expense of the improvement to be estimated and declare what portion thereof *shall be assessed* and for notice of opening of the rolls to public inspection and for a hearing and opportunity for owners of property *to be assessed* to object to improvement all contemplate that the owners were to have the *right to object to the improvement before it was made,* hence, where such safeguard had not been provided the property owners may not be subjected to special assessments for improvements theretofore installed (Garden City Charter, § 45).

REFERENCES FOR POINTS IN HEADNOTES

[1, 4] 48 Am Jur, Special and Local Assessments §§ 7, 17, 151–176, 242–255.
[2] 38 Am Jur, Municipal Corporations § 497.
[3] 48 Am Jur, Special and Local Assessments § 302.
[5] 48 Am Jur, Special and Local Assessments § 285.
[6] 48 Am Jur, Special and Local Assessments §§ 302–309.

2. SAME—CHARTERS—PUBLIC IMPROVEMENTS—APPROPRIATIONS—CON-
TRACTS.

    City charter provisions which prohibit the letting or making
of a contract for public improvements until an appropriation
to pay the cost thereof shall have been made from funds on
hand or legally available or until a tax or assessment shall
have been duly levied or bonds authorized and sold to pay
such cost and providing that any contracts made in violation
of the section shall be void rendered void construction con-
tracts for sewers, water mains, and a pumping station which
had not been preceded by a duly-made appropriation (Garden
City Charter, § 42-A).

3. SAME—PUBLIC IMPROVEMENTS—CHARTERS—JURISDICTION.

    The making of estimates of the costs of public improvements
may, by a city charter, be made jurisdictional to the power
to make a special assessment for the payment of the cost of
the improvement (Garden City Charter, § 45).

4. SAME — PUBLIC IMPROVEMENTS — OBJECTION — SPECIAL ASSESS-
MENTS.

    The failure to give a property owner an opportunity to object
to a public improvement before it is installed is fatal to the
validity of the special assessment within a city (Garden City
Charter, § 45).

5. SAME—PUBLIC IMPROVEMENTS—SPECIAL ASSESSMENTS—ESTOPPEL.

    Property owners in a city were not estopped from objecting to
special assessments for sewers, water mains, and a pumping
station on the grounds of their invalidity by the fact that
they have enjoyed the benefits of the improvements (Garden
City Charter, § 45).

6. SAME—PUBLIC IMPROVEMENTS—CONSTRUCTION CONTRACTS—SPE-
CIAL ASSESSMENTS.

    Special assessments upon property owners to pay for obligations
incurred under construction contracts by city for sewers, water
mains, and a pumping station are invalid, where the construc-
tion contracts themselves are invalid (Garden City Charter,
§ 42-A).

Appeal from Wayne; Kane (Edward T.), J., pre-
siding. Submitted December 3, 1963. (Calendar No.
102, Docket No. 49,661.) Decided December 27,
1963.

Bill by Walter E. Smith, Mary B. Smith and other property owners against the City of Garden City, a municipal corporation, to invalidate special assessment and enjoin collection thereof.   Decree for plaintiffs.   Defendant appeals.   Affirmed.

*Fox, Fox & Fitzer,* for plaintiffs.

*Berry, Hopson & Francis,* for defendants.

DETHMERS, J.  Plaintiffs are owners of real estate in defendant city.  They brought this suit to have certain special tax assessments against their properties for sewers, water mains, and a pumping station, decreed to be void and enforcement thereof enjoined.

In 1955 the Biltmore Building Company, not a party to this suit, subdivided certain land it owned in defendant city into lots and built houses on them. Some of plaintiffs' lots are in, and others adjacent to, the Biltmore subdivisions.  Biltmore desired construction of the sewers, water mains, and pumping station to make its lots suitable for residential use. Benefits from such improvements, subsequently made, accrued not only to Biltmore's properties, but, as well, to those of plaintiffs.

On May 10, 1955, a written agreement was signed by Biltmore and by the mayor and clerk of defendant city, without authorization of the city council.  It provided in part as follows:

"Whereas, the company is desirous of developing and building homes in the following subdivisions, * * * (list follows) and the city is desirous of assisting in the providing of required sewer, water and paving therefor:  * * *

"The company agrees to provide for installation of sewers, water  * * *

"The entire cost of the above installation is to be paid to the city by the company before any contracts shall be let for such installation or work begun.. * * *

"The city agrees to make special assessment levies for the cost of such construction to each premises benefited by said sewer, paving and water, prorated according to the total cost thereof, such assessments to be prorated over * * * years, the same to be collected by the city; * * *

"The city will pay to the company annually the amount of special assessment charges received by it during the previous year, provided that such payments shall not exceed the total paid to the city for such construction by the company. Provided further that the special assessments made against all property owned by the company as shown on the attached map, shall immediately be receipted for as paid in full, and the company agrees that such receipts shall constitute reimbursement to it of the amounts thereof as provided herein."

From May 4, 1955, to February 6, 1956, 6 contracts were executed by and between defendant city and certain contractors for construction of the mentioned improvements. From May 10, 1955, to December 12, 1956, Biltmore made a series of escrow deposits in the amounts necessary to pay for the improvements under those construction contracts. The improvements were completed before December 31, 1956, and the moneys in escrow therefor were paid out to the contractors.

In November of 1959 the city set up special assessment districts for the purpose of assessing the costs of those improvements. The assessment rolls were opened for public inspection, public meetings thereon were held, less than 1/2 of the property owners objected and, on January 27, 1960, the special assessments were confirmed. Some $549,000 was assessed, of which $85,485.13, on property not belonging to

Biltmore, was to be collected by the city and, under the agreement with Biltmore, paid over to Biltmore, but the remainder, on Biltmore's property, the city was not to collect but mark paid by Biltmore.

Relevant provisions of the city charter read as follows:

"Sec. 30. * * * Unless by the affirmative vote of 3 members of the council, no office shall be created or abolished, no tax or assessment be imposed, * * * nor any money appropriated, unless otherwise provided by this charter."

"Section 42–A. No public work, improvement or expenditure, shall be commenced, nor any contract therefor be let or made, until a valid specific appropriation to pay the cost thereof shall have been made by the council from funds on hand and legally available for such purpose, or until a tax or assessment shall have been duly levied or bonds authorized and sold to pay the cost and expense thereof, and no such work or improvement shall be paid for, or contracted to be paid for except from such specific appropriation, or from the proceeds of such tax or assessment thus levied, or from the proceeds of bonds or notes legally issued, and any contract, agreement or commitment whatsoever made in violation of this section shall be void as against the city."

"Section 45. Whenever the council shall determine that the whole or any part of the expense of any public improvement shall be defrayed by an assessment on the owners of land to be benefited thereby, it shall cause the expense of such improvement to be estimated and shall declare by an entry on its journal whether the whole or what portion thereof shall be assessed to such owners and occupants, specifying the sum to be assessed, the number of installments in which it may be paid, and the portion of the city which it deems to be benefited. The council shall cause an assessment of the sum to be assessed to be made upon all lands within the desig-

nated portion of the city according to benefit. The assessment roll shall be open to public inspection for a period of 7 days before the council shall meet to review the roll and hear complaints. The clerk shall give notice in advance by publication of the opening of the roll to public inspection and of the meeting of the council to hear complaints. If at or prior to the hearing, the owners of more than 1/2 of the property to be assessed shall object in writing to the improvement, the assessment shall not be made without the unanimous vote of the council."

"Section 49. Subject to the limitations provided by this charter and State law, the council may borrow money and issue bonds on the credit of the city for public improvements, for acquiring, owning, purchasing, extending, or constructing, or paying for public improvements in anticipation of the collection of special assessments previously made, and for any and all other lawful purposes, with the approval of 3/5 of the electors voting on the question at any election, either general or special, to be held at such time, place and manner as is provided in this charter for holding elections; and without such approval for special assessments to a limit of 1%, in any 1 year, of the taxable valuation of the city, and for emergency purposes as authorized by State law."

The trial court entered a decree granting plaintiffs the relief prayed. Defendant appeals.

Questions raised by defendant on this appeal are:

"1. Are special assessments imposed under section 45 of the charter of the city of Garden City void if they are imposed after the related improvements have been made?

"2. Does section 42–A of the charter of the city of Garden City require that all special assessments imposed by the city of Garden City be imposed prior to the related improvements being made?"

Plaintiffs agree that the first is a proper statement of question involved, but say that the second should be stated differently, as follows:

"Are the improvement construction contracts * * * valid under section 42–A of the charter of the city of Garden City, and if not, can valid special assessments be based upon such contracts?"

Touching the question whether the assessments were void under section 45 of the charter, we note that the section provides for defraying the expense of improvements by assessments on the "owners of the land to be benefited thereby" not of land already benefited thereby. Thus the section contemplates the levying of assessments for improvements to be made in the future, not those completed in the past. This is not obviated by the fact that such benefits might continue to accrue in the future. Also, section 45 provides that when such assessment is intended the council shall cause the expense of the improvement to be estimated and declare, by an entry on its journal, what portion thereof shall be assessed. That was not done here. The expense had been paid 3 years before the assessment procedure commenced. Then section 45 provides for notice of opening of the roll to public inspection and a hearing and opportunity for owners of property to be assessed to object to the improvement. This is all to precede action by the council confirming the assessment. Here there was no effective opportunity, during the assessment proceeding, for the property owners to object to making the improvement because it already was 3 years old. The rights and safeguards thus afforded the property owners by section 45 were completely circumvented by the course here pursued.

Section 42–A of the charter prohibits letting or making of a contract for public improvements until

(1) an appropriation to pay the cost thereof shall have been made from funds on hand or legally available or (2) until a tax or assessment shall have been duly levied or bonds authorized and sold to pay such cost and provides that any contracts made in violation of the section shall be void. Here the making of the construction contracts were not preceded by an appropriation. The making of the Biltmore agreement did not constitute an appropriation because (a) it was not done by majority vote, or any vote, of the city council as required by section 30 of the charter; (b) if it otherwise could be deemed an appropriating act, it was not, as section 42-A requires, an appropriation "from funds on hand" because the funds were not on hand when that agreement was made; (c) nor could it be an appropriation from funds "legally available", as in section 42-A provided, the funds not being legally available inasmuch as the Biltmore agreement was invalid for lack of council approval, it called for payment of the costs out of special assessments to be made in the future contrary to section 42-A requirements of a pre-existing assessment, and it could not be deemed money available from lawful borrowing because section 49 requires for that purpose a vote of approval, lacking here, of 3/5 of electors voting thereon, except under special circumstances not here shown, and then only when done in anticipation of the collection of "special assessments previously made", not, as here, assessments to be made some years later. Thus, section 42-A requirements fared little better at the hands of the city council than did those of section 45, as above noted.

The making of estimates of the costs of improvements, as in charter section 45 provided, was held to be jurisdictional to the power to make the special assessment for payment of the cost of the improve-

ments in *Butler* v. *City of Detroit,* 43 Mich 552, and *Mills* v. *City of Detroit,* 95 Mich 422. See, also, *Bay City Traction & Electric Co.* v. *Bay City,* 155 Mich 393.

Failure to give the opportunity to object to the improvement required by section 45 is also fatal to the validity of the assessment. See *Auditor General* v. *Calkins,* 136 Mich 1; *Thayer Lumber Co.* v. *City of Muskegon,* 152 Mich 59; *Rood* v. *City of Detroit,* 256 Mich 547.

The property owners are not estopped by the fact that they have enjoyed the benefits of the improvements from objecting to the assessments on the grounds of their invalidity. *Macomb Building Co.* v. *Clinton Township,* 309 Mich 236.

When the construction contracts are invalid, as they are here, the assessments are likewise so. *Whitney* v. *Village of Hudson,* 69 Mich 189.

Plaintiffs were entitled to the relief sought.

Affirmed. Costs to appellees.

CARR, C. J., and KELLY, BLACK, KAVANAGH, SOURIS, SMITH, and O'HARA, JJ., concurred.