JOHNSON v CITY OF INKSTER

1. Municipal Corporations—Assessments—Special Assessments—Public Improvements—Benefit to Property—Abutting Property.

A benefit must be conferred upon assessed property over and above that conferred upon the community itself in order for a special assessment to be valid, and a municipality's assessments do not have to be confined to abutting property owners, but can be applied to any land within its borders which derives a special benefit from the improvements.

2. Municipal Corporations—Assessments—Special Assessments—Street Improvements—Nonabutting Property.

Nonabutting property may be assessed where a street is widened or paved.

3. Appeal and Error—Review—De Novo Review—Findings.

The Court of Appeals, when reviewing a case *de novo*, will not reverse the lower court where there is evidence and testimony to support the finding of the lower court unless justice demands, or the evidence clearly preponderates the other way.

4. Municipal Corporations—Assessments—Special Assessments—Street Improvements—Reasons for Improvements—Nonabutting Property—Access—Value of Property.

A finding that interior properties were specially benefited by a street widening and improvement and that a special assessment against such nonabutting property was valid, was proper where access of policemen and firemen to the interior properties was substantially improved, where surveys indicate that the improved street is used for many automobile trips by the residents of the interior lots and the street was made safer and faster-moving, and where testimony indicates that the im-

References for Points in Headnotes

[1, 2, 4–6, 9] 70 Am Jur 2d, Special or Local Assessments §§ 9 *et seq.,* 33–42.

[3] 5 Am Jur 2d, Appeal and Error § 703.

[7, 8] 56 Am Jur 2d, Municipal Corporations, Counties and Other Political Subdivisions §§ 565, 566.

proved access enhances the value of the interior lots by an amount at least equal to the assessment; if property receives a special benefit from an improvement it is subject to assessment regardless of the reason or motive for the improvement.

5. MUNICIPAL CORPORATIONS—ASSESSMENTS—SPECIAL ASSESSMENTS—.
   STREET IMPROVEMENTS—SPECIAL ASSESSMENT DISTRICTS—
   BOUNDARIES—BENEFITS.

   Establishment of the boundaries of a special assessment district halfway between a street being improved and the next major street was not arbitrary, capricious, unreasonable or an abuse of discretion where the boundaries were based on the city assessor's determination that those residents located closer to the improved street than to the next major street would specially benefit from the reconstruction because they were the ones who used the street being improved.

6. MUNICIPAL CORPORATIONS—ASSESSMENTS—SPECIAL ASSESSMENTS—
   PROPORTION TO BENEFIT—PROPERTY OWNERS—BURDEN OF
   PROOF.

   The burden is on a property owner to prove that the amount of a special assessment is not proportionate to the benefit received from an improvement, and the amount of a special assessment is held proper where the property owner failed to meet that burden.

7. MUNICIPAL CORPORATIONS—STREET IMPROVEMENTS—CONSTRUCTION
   CONTRACTS—CITY CHARTERS—ORDINANCES.

   A construction contract for a street improvement, which made construction conditional upon successful financing by the city, substantially complied with the intent of the city charter and an ordinance which provides that contracts for improvements are not to be let nor construction begun before funds to pay the cost thereof have been provided by the city council (Inkster City Charter, Section 13.1(e); Ordinance No. 114).

8. MUNICIPAL CORPORATIONS—STATUTES—ORDINANCES—CITY CHAR-
   TERS—PURPOSES—CONSTRUCTION CONTRACTS—COUNTY ROADS.

   The spirit and purpose of a statute should prevail over its strict letter, and where the purpose of a city charter provision and an ordinance is to insure that in the construction of a municipal improvement the financing arrangements will be complete before the city's assumption of a contractual obligation, a city acted responsibly in making a contract conditional on successful financing in a situation where the project involved a county road running through the city and coordination between the

two governmental units required the making of a contract before the city could know its share of the project's cost.

9. MUNICIPAL CORPORATIONS—ASSESSMENTS—SPECIAL ASSESSMENTS— STREET IMPROVEMENTS—CONSTRUCTION CONTRACTS—BONDS— BREACH OF CONTRACT—DEFENSES.

A special assessment for a street improvement is not rendered invalid because construction began prior to the city council's approval of the sale of bonds to finance the project, where the construction contract with the county road commission specifically provided that construction was not to begin until after the issue of bonds by the city, and the county road commission breached that contract by starting construction prior to the necessary action of the city council; if financing had not been secured the city could have asserted the breach of contract as a defense to an action for the construction costs.

Appeal from Wayne, James Montante, J. Submitted Division 1 November 7, 1974, at Detroit. (Docket No. 16884.) Decided November 25, 1974. Leave to appeal applied for.

Complaint by Willie Johnson, as representative of a class of property owners, against the City of Inkster and Bruce Cook, Treasurer of the City of Inkster, to enjoin collection of special assessments. Judgment for defendants. Plaintiffs appeal. Affirmed.

*Sommers, Schwartz, Silver, Schwartz, Tyler & Gordon, P. C.* (by *David L. Nelson*), for plaintiffs.

*Meyers & Schlenker,* for defendants.

Before: J. H. GILLIS, P. J., and ALLEN and PETERSON,* JJ.

J. H. GILLIS, P. J. On March 5, 1970 the City of Inkster and the Wayne County Road Commission entered into an agreement to share the cost of widening and reconstructing that section of Mid-

* Circuit judge, sitting on the Court of Appeals by assignment.

dlebelt Road which runs through Inkster. Middlebelt is a county primary road which extends north and south through Wayne County. Prior to reconstruction, Middlebelt Road within Inkster was two lanes wide, asphalt paved without curbs or gutters. It handled not only local traffic, but also heavy through traffic, due to its proximity to Wayne County Metropolitan Airport. However, a bottleneck existed at Inkster's north and south boundaries because Middlebelt was four lanes immediately to the north and five lanes immediately to the south.

On July 7, 1971, the Inkster city council, by resolution, determined the necessity for the improvement of Middlebelt and further resolved that the City's 40% share of the estimated $604,000 reconstruction cost[1] should be financed in part by special assessment. The resolution also described the area to be assessed, Special Assessment District No. 169.

The special assessment district consists primarily of nonabutting residential property directly east and west of Middlebelt Road. It extends to a depth of approximately 1500 feet on each side of the road. The outermost east-west limits of the district correspond with the halfway point between Middlebelt and the next major north-south street. The residential properties directly abutting Middlebelt were not included in the assessment district. The city assessor concluded that under Michigan law a municipality cannot assess abutting property for road widenings. His opinion, based on two Michigan Supreme Court decisions, *Fluckey v City of Plymouth,* 358 Mich 447; 100 NW2d 486 (1960); and *Brill v Grand Rapids,* 383 Mich 216; 174 NW2d 832 (1970), is not challenged by plain-

---

[1] The estimated cost was later increased to $620,000.

tiff. Therefore, we do not have to decide whether *Fluckey* and *Brill* would have, on the facts of this case, prohibited the assessment of abutting property owners.

By resolution of August 2, 1971 the city council gave its final approval to the procedure and formula adopted by the assessor to figure the amount of the special assessment. The assessor determined that the project would cost the city $30.50 per frontal foot.[2] He then adopted a "unit of benefit" method of assessment, the dollar value of a unit being $30.50. He determined that each interior lot received 3.6 units of benefit, the assessment per lot, therefore, being $109.80. The "unit of benefit" plan was applied to all lots, improved or unimproved, vacant or otherwise, irrespective of the value of the structure thereon. However, if there was a two or four-family structure on the lot, the units of benefit were doubled to 7.2.

On September 1, 1971, plaintiff Willie Johnson, representing the class of all interior property owners in district No. 169, filed this lawsuit in Wayne County Circuit Court challenging, on a number of grounds, the validity of these special assessments. The circuit court upheld the actions of the City of Inkster, and plaintiff appeals.

I

*Does the reconstruction of Middlebelt Road specially benefit the property within the assessment district?*

In order for a special assessment to be valid, there must be a benefit conferred on the assessed property "over and above that conferred upon the

---

[2] His original determination of $33.55 per frontal foot was reduced to $30.50 after public hearings.

community itself". *Fluckey v City of Plymouth,*
supra, 453; 100 NW2d 489. See *Carmichael v
Beverly Hills,* 30 Mich App 176; 186 NW2d 29
(1971). *Fluckey,* 453–454; 100 NW2d 489, quoting
from 2 Cooley, Taxation (3d Ed), pp 1153, 1154,
said:

" 'The general levy of taxes is understood to exact
contributions in return for the general benefits of gov-
ernment, and it promises nothing to the persons taxed,
beyond what may be anticipated from an administra-
tion of the laws for individual protection and the gen-
eral public good. Special assessments, on the other
hand, are made upon the assumption that a portion of
the community is to be specially and peculiarly bene-
fited, in the enhancement of the value of property
peculiarly situated as regards a contemplated expendi-
ture of public funds; and, in addition to the general
levy, they demand that special contributions, in consid-
eration of the special benefit, shall be made by the
persons receiving it. The justice of demanding the spe-
cial contribution is supposed to be evident in the fact
that the persons who are to make it, while they are
made to bear the cost of a public work, are at the same
time to suffer no pecuniary loss thereby; their property
being increased in value by the expenditure to an
amount at least equal to the sum they are required to
pay.' "

Where a municipality has the power to levy
special assessments, it does not have to confine its
assessments to abutting property owners, but can
assess any land within its borders which derives a
special benefit from the improvements. 14 Mc-
Quillin, Municipal Corporations (3d Ed), § 38.72, p
205; 16 Callaghan's Michigan Civil Jurisprudence,
Local Improvements and Assessments, § 51, pp
247–248; see *Crampton v Royal Oak,* 362 Mich 503;
108 NW2d 16 (1961). Specifically, it has been held
that where a street is widened or paved, nonabut-

ting property may be assessed. *Goodrich v City of Detroit*, 123 Mich 559; 82 NW 255 (1900); *Roberts v Evanston*, 218 Ill 296; 75 NE 923 (1905); *Jacksonville v Padgett*, 413 Ill 189; 108 NE2d 460 (1952).

The trial court held, based on extensive expert testimony, that the interior properties were specially benefited by the reconstruction of Middlebelt Road. Specifically, the trial judge found that the nonabutting lots benefited because of:

"(a) Improved access to Middlebelt Road.

"(b) Improved movement of through traffic on Middlebelt.

"(c) Elimination of the deteriorated condition of Middlebelt.

"(d) Elimination of open ditches and swales which occasionally contain stagnant water.

"(e) Elimination of hazardous traffic conditions.

"(f) Stabilization of the neighborhood from further deterioration.

"(g) Enhancement of property values for potential buyers."

Our review is *de novo*. Ordinarily, we "will not reverse the lower court where there is evidence and testimony to support the finding of the lower court unless justice demands, or the evidence clearly preponderates the other way". *Osius v Dingell*, 375 Mich 605, 611; 134 NW2d 657 (1965); see *Wabeke v City of Holland*, 54 Mich App 215; 220 NW2d 756 (1974).

We have reviewed the record carefully. We think that the evidence supports the holding and factual findings of the trial court. While it is not necessary to summarize all the testimony, we do think it is important to mention the testimony which most persuasively supports the actions of the City of Inkster.

The new Middlebelt Road is five lanes wide, two

lanes for traffic in each direction and a center left-turn lane. By adding three lanes and eliminating the bottleneck situation, access to the interior properties has been substantially improved. This is important for a number of reasons. First, policemen and firemen can reach their destinations considerably faster. We think this benefit, which is not shared by the city at large, is in itself sufficient to justify this assessment.

Second, traffic surveys indicated that the residents of each interior lot make an average of three automobile trips per day from their homes, and that Middlebelt is used for a portion of many of these trips. This also proves that a safer and faster-moving Middlebelt is used for a portion of many of these trips. This also proves that a Middlebelt Road is more of a benefit to the residents of district #169 than it is to the rest of the city.

Third, two appraisers testified that facilities for ingress and egress to property affect the value of that property. Each testified that the reconstruction of Middlebelt Road improved the access to the interior properties and that the reconstruction enhanced the value of these lots in an amount at least equal to the assessment.

Plaintiff contends that the primary reason for the reconstruction of the road was to improve access to Wayne County Metropolitan Airport. He argues that any benefit to the assessed properties is purely incidental. This may be true, but it's irrelevant. If property receives a special benefit from an improvement, it is subject to assessment regardless of the reason or motive for the improvement.

## II

*Was the method used to determine the perime-*

*ters of the special assessment district arbitrary, capricious and unreasonable?*

The east-west boundaries of the assessment district correspond with the halfway point between Middlebelt and the next major city street. These perimeters were based on the city assessor's determination that those residents located closer to Middlebelt than to the next major street would specially benefit from the reconstruction because they were the ones who used Middlebelt. Those residents located beyond the perimeters would naturally use, not Middlebelt, but the closer through street for ingress and egress from their neighborhoods. *Crampton v Royal Oak,* 362 Mich 503, 514–515; 108 NW2d 16, 21 (1961), said:

"It is further contended by appellants that the special assessment district is not properly constituted. It may be stated generally that the district as created by action of the city commission embraces lands within reasonable proximity to the contemplated improvement. There is nothing in the record before us to suggest fraud or mistake, or that the action of the commission was arbitrary or capricious. Invariably when a special assessment district is created, as in the instant case, opinions may differ as to its proper extent and its inclusion, or noninclusion, of specific property therein. The creating of the district was within the legislative powers of the commission, and the presumption of validity attaches to the action taken. We find no basis for a conclusion that the legislative discretion vested in the commission was abused. *City of Detroit v Weil,* 180 Mich 593; 147 NW 550 (1914)."

We hold that the City of Inkster did not abuse its discretion in establishing the boundaries of the special assessment district.

III

*Was the formula used to determine the amount*

*of the special assessment arbitrary, capricious and unreasonable?*

Earlier in this opinion we briefly described the "unit of benefit" formula used by the city assessor for determining the amount of assessment. At trial he described the process in much greater detail, and testified that he consulted with various experts concerning his assessment methods. A municipal financial consultant testified that the unit of benefit formula used by the city was a "proper and equitable" method of assessment.

The City of Inkster charter, § 12.4, provides in part that "all special assessments levied shall be in proportion to the benefits derived from the improvement". See *Panfil v Detroit,* 246 Mich 149; 224 NW 616 (1929); *Wood v Village of Rockwood,* 328 Mich 507; 44 NW2d 163 (1950). The burden is on the property owner to prove that the amount of the assessment is not proportionate to the benefit received. *Thompson v Dearborn,* 349 Mich 685; 85 NW2d 122 (1957). Plaintiff has failed to meet that burden, and we hold that the amount of the assessment was proper.

## IV

*Did the City of Inkster violate its charter and special assessment ordinance, thereby invalidating the assessment?*

The contract between the Board of Wayne County Road Commissioners (hereinafter referred to as the "Board") and the City of Inkster is essentially a construction contract. The Board contracted in the role of a general contractor responsible for the reconstruction of Middlebelt Road.

The Inkster City charter, § 13.1(e) provides:

"No public work, or improvement shall be com-

menced, nor any contract therefor be let or made, until a valid specific appropriation to pay the cost thereof shall have been made by the Council from funds on hand and legally available for such purpose, or until a tax or assessment shall have been levied or bonds authorized and sold to pay the cost and expense thereof."

Similarly, the special assessment ordinance No. 114, § 25 provides:

"No contract for the construction of any improvement shall be let nor shall the construction of any such improvement be begun until money to pay the cost thereof has been provided for in the manner in this Chapter required; nor shall any contract be but otherwise than as provided."

The contract was entered into March 5, 1970. On August 2, 1971, the special assessment district was approved by the city council. The reconstruction of Middlebelt Road began on August 15, 1971. And on September 7, 1971 the council approved the sale of motor vehicle highway bonds to provide for the additional financing of the project.

First, plaintiff contends that since the contract was made before financing arrangements had been completed, the contract violates the charter and the ordinance. He further contends that since the contract is invalid the assessments are also invalid. Plaintiff relies on *Smith v Garden City,* 372 Mich 189; 125 NW2d 269 (1963). We disagree with plaintiff's argument.

First, *Smith, supra,* is not controlling authority. Its factual setting is inapposite with the facts here. Most importantly, in *Smith* the construction (sewers and water mains) was completed three years before the attempted special assessment.

Second, performance of the contract is made

conditional on successful financing by the city. The contract specifies:

"The Board shall, upon the approval of the plans and specifications by the City and subsequent to the successful issue of bond issues by the Board and the City, which applications for these bond issues refer to the construction of this project as part of the proposed use of the bond issue, proceed toward the construction of the project, for which the total estimated cost is Six Hundred Four Thousand Dollars ($604,000.00)."

Relying on this provision the trial court held that the contract "substantially complies with § 13(e) * * * of the Inkster charter because it contains a clause which reasonably indicates the intentions of the parties to place the construction of the project contingent upon the raising of the proper revenue". On the particular facts of this case, we agree with the trial court that this contract substantially complies with the intent of the charter and ordinance provisions.

While this is a construction contract, we think it is different in kind from the typical construction contract envisioned by the charter and ordinance. Normally a contract for a municipal improvement involves only one municipality. For example, if Inkster wanted to improve a street wholly within its jurisdiction, it would contract for the work with a private construction firm. The purpose of charter and ordinance is to insure that in these typical situations the financing arrangements will be complete prior to the city's assumption of a contractual obligation.

However, here the road to be improved was a county road running through a city. Agreement had to be reached between two municipalities. In this situation the only logical course for Inkster to

follow was to enter into a contract before it at-
tempted to secure financing. It could not make
financial plans until it knew its share of the
proposed project's cost. We think the City of Ink-
ster acted responsibly here. By making the con-
tract conditional on successful financing, it did all
it could reasonably be expected to do to comply
with the spirit and purpose of its charter and
ordinance provisions. The spirit and purpose of a
statute should prevail over its strict letter. *Smith
v City Commission of Grand Rapids,* 281 Mich 235;
274 NW 776 (1937); *Aikens v Department of Con-
servation,* 387 Mich 495; 198 NW2d 304 (1972).

Second, plaintiff contends that the charter and
ordinance provisions were violated because con-
struction began prior to the city council's approval
of the sale of the bonds, and that, therefore, the
special assessment is invalid. We disagree.

The contract provides that the Board will not
begin construction until after "the successful issue
of bond issues" by the city. By exacting this prom-
ise from the Board, Inkster did all it could do to
insure that construction would not begin until
after financing arrangements were completed. The
Board, by commencing construction prior to the
city's approval of the bond issue, breached the
contract. If Inkster had not secured financing, it
could have asserted the breach of this contract
provision as a defense to an action by the Board
against it for construction costs. However, this
breach does not support plaintiff's claim that the
city's special assessment of their property is in-
valid.

Plaintiff's other allegations of error are without
merit. We affirm the trial court's holding. No
costs, a public question being involved.

All concurred.